HARRISON DURKEE v. THE VERMONT CENTRAL RAILROAD COMPANY.

*Proof of telegraphic communications. Variance. Contract, construction and performance of. Right of broker to compensation where his authorized negotiations are abandoned by his employer.*

Where a telegraphic communication is relied on to establish a contract, it must be proved as other writings are by a production of the *original.* If that is lost, it may be proved by a copy if there is one; and if there is not, by oral testimony respecting it.

The original, where the person to whom it is sent takes the risk of its transmission, or is the employer of the telegraph, is the message delivered to the operator.

But where the person sending the message takes the initiative, so that the telegraph is to be regarded as his agent, the original is the message actually delivered at the end of the line.

The declaration alleged that, in consideration the plaintiff would negotiate a loan of an amount not exceeding one hundred thousand dollars, the defendants promised to pay a certain commission upon such amount as the plaintiff should negotiate a loan for. The contract proved was for the negotiation of a loan for, and the payment of a commission upon the full sum of one hundred thousand dollars. *Held*, no variance.

The plaintiff contracted with the defendants to negotiate a loan of one hundred thousand dollars to them, and did negotiate for such a loan with one H., upon the condition that what the plaintiff's brother was owing H. should constitute a part of it, and this amount the plaintiff expected to cash to the defendants at the time the loan was made. *Held*, that this constituted a sufficient compliance with the contract on the plaintiff's part.

*Held*, also that the negotiation with H. as detailed in the testimony *q. v.* was for such a loan as was authorized by the letter of the defendant's treasurer, *q. v.*

Question as to the right of a broker to a commission, or other compensation, for negotiating a loan which the party employing him does not avail himself of, considered.

If a party proceed with reasonable despatch in the performance of his part of a contract, and is met by a positive refusal of the other party to perform on his part, it is not necessary, in order to entitle the first party to damages on account of such refusal, that he should show any performance or readiness to perform on his part after that time.

If a party aver a full readiness on his part to perform a contract, and the proof shows a part readiness, and that his authority was then revoked, it is not a case of variance, but only of an averment beyond the proof.

ASSUMPSIT. The action was brought to recover the amount of certain commissions alleged to have been earned by the plaintiff in the negotiation of a loan to the defendants. The declaration contained several counts to which was afterwards added a new count which was spoken of as the amended count, and was as follows:

"For that the defendants in consideration that the plaintiff would, within a reasonable time thereafter, negotiate for and on behalf of the said defendants a large loan, to wit, a loan of one hundred thousand dollars, at the rate and interest of seven per cent. per annum, upon the security to be made by the said defendants therefor, when said loan should be negotiated, of seven promissory notes of equal amount, making in the total the amount of such loan, to be executed by said defendants and endorsed by

Josiah Quincy, Jr., or executed by said Josiah Quincy, Jr., and secured by the bonds so called of the said defendants as collateral thereto, at a fair rate as the said plaintiff might be able to negotiate for said loan, said notes to be payable in six, seven, eight, nine, ten, eleven and twelve months from the completion of said loan, respectively, undertook and then and there faithfully promised the plaintiff to pay him for so negotiating said loan, the sum of one-half of one per cent. per month upon such amount of money, as the plaintiff should so negotiate said loan for, for the time it should so have to run for his service and commission in the premises.

"And the plaintiff avers that he, relying upon the said promise and undertaking, did, within a reasonable time after the making of the same as aforesaid, to wit, on the 24th day of May, 1851, at said Burlington, negotiate for and on behalf of the said defendants, said loan to the amount of one hundred thousand dollars, at the rate per cent. and upon the terms and securities hereinbefore set forth, with one H. M. Holbrook, and upon the consideration that said plaintiff should and would furnish, as part of said loan of one hundred thousand dollars, a certain sum of money equal to a debt then due to said Holbrook from one Charles Durkee, to wit, the sum of six thousand dollars.

"And the plaintiff avers, that the said defendants were afterwards and within such reasonable time, to wit, on the day last aforesaid, to wit, at Burlington, notified of the negotiation of said loan as aforesaid, and were by the said plaintiff then and there requested to furnish said notes and securities, and receive therefor said amount of said loan, which the said plaintiff was then and there ready and willing, as was the said Holbrook, to complete and furnish as aforesaid, of all of which the said defendants then and there had notice. Nevertheless the defendants, their said promise and undertaking not regarding," &c., (alleges a breach or refusal of the defendants to accept of said loan, &c.)

Plea, the general issue; trial by jury, November Term, 1856, — Peck, J., presiding.

The plaintiff offered, 1st. The deposition of J. H. Peck, and upon the objection of the defendants the court excluded that part of the same relating to the contents of the telegraphic despatch

received by him from the plaintiff, and marked [——], to which decision the plaintiff excepted ; the rest of said deposition was read to the jury. 2d. Another deposition of J. H. Peck, taken on the part of the plaintiff, which was also read. 3d. The deposition of the plaintiff. The defendants objected to that part of it which related to the contents of the telegraphic despatch sent by the plaintiff to J. H. Peck, and marked [——], and the same was excluded by the court, to which the plaintiff also excepted.

The defendants offered and read the depositions of H. M. Holbrook taken by the defendants, and the deposition of Josiah Quincy, Jr.; also a letter from J. H. Peck to said Quincy, dated March 31st, 1851.

The plaintiff then read another deposition of J. H. Peck taken by the defendants, and also another deposition of H. M. Holbrook taken by the plaintiff.

It was conceded by the defendants that Josiah Quincy, Jr. was, during the time in question, the treasurer and financial manager of the defendants, and authorized by them to act in the premises as he did.

Upon this evidence the defendants insisted, *First*, that the evidence did not support the special counts, or as the same were amended by leave of the court. *Second*, that upon this evidence the plaintiff was not entitled to recover, for various reasons assigned ; and thereupon the court directed a verdict for the defendants, and rendered judgment thereon, to which the plaintiff excepted.

The substantial parts of the depositions and letters referred to are as follows, such portions of them as are to the same effect with what appears elsewhere, and those parts of them which relate to immaterial details being in many instances entirely and in others partially omitted.

*John H. Peck's deposition,* (first referred to).

In the first part of the year 1851 the finances of the Vermont Central Railroad were intrusted to Josiah Quincy, Jr., the treasurer of the company ; he had authority to raise money by loan on the notes and bonds of the company. He authorized me to bor-

row money by a letter dated March 6th, 1851, which is annexed hereto marked A.

I employed Harrison Durkee to borrow one hundred thousand dollars on six, seven, eight, nine, ten, eleven and twelve months, payable in equal installments; interest was to be seven per cent. per annum, and I was to give Durkee half of one per cent. a month commission. The time when this authority was given me is shown by the letter. It was verbally renewed to me by Mr. Quincy in the early days of May, 1851, at a casual meeting in Montpelier. I then immediately authorized Mr. Durkee to make the loan. On the 9th of May, a few days after meeting Mr. Quincy and after I had given authority to Mr. Durkee to make the loan, I received from the latter a telegraphic despatch [asking me if he should effect a loan]. I at once answered him by telegraph, Yes.

On the evening of Saturday, the 24th of May, I received a note from Mr. Quincy, dated the 22d of May, requesting me to discontinue negotiations. I then immediately wrote and telegraphed to Mr. Durkee to suspend the matter. He being at Saratoga where there was no telegraphic station, my despatch went to Troy, the nearest station, whence it was forwarded, but did not reach him, as I subsequently learned from him, until after he had been notified by Mr. Holbrook, as he stated, that his proposal for the money had been accepted, and the money was ready; he accordingly advised me by letter or telegraph, of his being ready to furnish the amount, and would leave in a day or two for Boston *via* Burlington to complete the arrangement.

I learned that Mr. Quincy was personally indebted to Mr. Holbrook to the amount of forty-one thousand dollars, which, as Mr. Holbrook afterwards told me, would be required by him to enable him to furnish the loan.

*Letter A, referred to.*

"Boston, March 6th, 1851.

"John H. Peck, Esq.,—Dear Sir:

"I hereby authorize you to borrow money for the Vermont Central Railroad; giving as security either their notes with my endorsement, or my individual name with their bonds as collateral

at a fair rate; or I will give stock of the Vermont & Canada Railroad as collateral to my own name.

"As a director and large stockholder, I shall trust the times and rates to your discretion.

"I am, very truly,       JOSIAH QUINCY, JR.,
                        "Treas. Vt. Cent'l R. Company."

*Second deposition of J. H. Peck,* (taken by the plaintiff).

I have given a deposition in this case before. When I say in said deposition I was to give Durkee one-half of one per cent. per month commission, I mean in behalf of said company. The letter of Mr. Quincy alluded to in said deposition, requesting me to discontinue negotiations, I have not, nor do I know where it is or what has become of it.

I went to Boston with Mr. Durkee; we called upon Mr. Quincy, and Mr. Durkee told him he was ready to furnish the one hundred thousand dollars. Mr. Quincy declined to receive the amount, saying he had made other arrangements, and could obtain the money at a lower rate. At the time of the date of Mr. Quincy's letter of authority, referred to in my former deposition, it was according to the usual course of business in such transactions for me to employ a third party to negotiate the loans. And, at the casual meeting referred to, Mr. Quincy requested me to obtain that one hundred thousand dollars as soon as possible, through Mr. Durkee or my friend in Troy, referring to Mr. Durkee.

*Deposition of the plaintiff.*

In the spring of 1851, I resided in Troy, N. Y. At that time John H. Peck of Burlington, Vermont, acting as the agent of the Vermont Central Railroad Company, applied to me to negotiate for said company a loan of one hundred thousand dollars. I was by him authorized to negotiate said loan on the company's notes, running from six to twelve months, I think, with security in Mr. Quincy's endorsement, or Mr. Quincy's note with the bonds of the company as collateral, at the option of the person loaning, and at the rate of seven per cent. per annum; and as a compensation for my services in negotiating the loan, I was to have one-half per cent. per month on such amount as I should negotiate. I accord-

ingly undertook to effectuate said loan, and made various ineffectual efforts so to do immediately, at considerable expense to myself, and from twenty to thirty days' time, worth twenty dollars per day. On or about the 9th of May, 1851, I ascertained that I could effect such loan with one H. L. Holbrook of Boston, and thereupon I telegraphed to said Peck at Burlington [inquiring if I should effect it and complete the negotiation]. I received the reply to said inquiry in the affirmative, and hereto attached, marked A. I thereupon proceeded to close said negotiation with said Holbrook, and did so on the 24th of May, 1851 ; said Holbrook accepting said proposition for a loan, according to the terms above stated, at the rate of seven per cent. per annum, only in consideration of my furnishing the sum of about six thousand dollars as part of said loan, it being the amount of a debt due to him from my brother, which I agreed to do. The acceptance of Mr. Holbrook is hereto attached, marked B. Mr. Holbrook was reputed to be, and I believe was, a man of large resources and abundantly able to carry out the proposition on his part. A few days afterwards Mr. Peck sent to me notice to discontinue the negotiation. At the time I was notified to desist, I had completed the negotiation on my part, so that nothing remained to be done but for the company to furnish the notes and security, and receive the cash. I then saw Mr. Peck, and we went to Boston together, saw Mr. Quincy, the treasurer, and offered to him to complete said loan as before stated, which I was then able, willing, ready and offered to do. Mr. Quincy refused to take the loan ; I don't remember that he assigned any reason why he did not. The commission proposed and promised by Mr. Peck, on the part of the company as above mentioned, was a fair rate of compensation at that time, and I was only able to negotiate the loan at seven per cent. by reason of my agreeing to take up the dishonored paper of my brother held by Holbrook as aforesaid.

*Telegraphic dispatch, marked A.*

" May 9th, 1851.

" Mr. Harrison Durkee, Saratoga :

" Yes ; effect it with Holbrook.     JOHN H. PECK."

*Letter of Holbrook, marked B.*

" Boston, May 24, 1851.

" H. Durkee, Esq., — Dear Sir :

" I shall accept your offer for the one hundred thousand dollars at seven per cent. per annum, and will arrange the same any day you may call on me.

" Please let me hear from you that I may provide the needful.

" Truly yours,     H. M. HOLBROOK."

*Deposition of H. M. Holbrook,* (taken by the defendants).

* * * * Mr. Durkee made a proposition to me to discount one hundred thousand dollars of the paper of the Vermont Central Railroad Company, endorsed by Josiah Quincy, Jr., together with the second mortgage bonds of the company as collateral security, at a per cent. that should be satisfactory to me. I mean that the collateral was to be taken at a discount or per centage that should be satisfactory to me. The notes were to be discounted at the rate of seven per cent. per annum. Payment of the proceeds was to be made in certain demands against Charles Durkee, one demand due to Holbrook, Carter & Co. of about sixty-five hundred dollars ; another due to Dutton, Richardson & Co. of about half that amount, and the balance in cash. I was one of the firm of Holbrook, Carter & Co., and was largely interested in the above debt. The arrangement was not concluded at that time.

Subsequently to this I called upon Mr. Josiah Quincy, Jr., at that time treasurer of the company, and communicated to him that I had arranged or was making an arrangement for the negotiation of one hundred thousand dollars, on a large amount of the notes of the Vermont Central Railroad Company endorsed by him, or his notes with the bonds of the company as collateral security. The object in speaking to Mr. Quincy was to ascertain to a certainty that there was no mistake about the notes. I asked Mr. Quincy, " If I make the negotiation and get the notes, is there any mistake about them ? " He replied, I think, " I don't think you can get them, there are no such notes out."

*Question.* State whether you wrote to said Durkee any letter

on or about the 24th of May, 1851? *Answer.* I did. After writing that letter I had an interview with Mr. Durkee in my counting-room where he informed me that the trade or negotiation either had fallen through, or would fall through, and would not be consummated. This was a few days after the writing of that letter.

*Ques.* State whether Mr. Durkee had, down to the interview referred to in your last answer, agreed with you to furnish the notes and securities referred to? *Ans.* Such an agreement might have been implied, but I cannot remember that he ever absolutely agreed to furnish the paper, although he had assented to the propositions I had made for negotiating it.

*Ques.* Did or did not Mr. Durkee ever say to you that he would furnish the notes and securities referred to? *Ans.* I can't recollect that he ever did.

*Ques.* When Mr. Durkee last called upon you as you stated above, what was your purpose as to perfecting the arrangements which had been contemplated between you and Durkee? *Ans.* My purpose or object was, in the first place, that the notes or security should be perfectly satisfactory to me. It is probable that I should have been so particular about the securities that he would not have complied with my requisitions, for the more I reflected upon the proposed negotiation, the less desirous I was of consummating it, and I was not sorry that it fell through, or had fallen through. I do not think I expressed any desire to consummate it.

*Cross-examination.* My available means and credit were at that time sufficient to raise the money to make the loan. I cannot remember that Mr. Durkee gave me any reason why the trade or negotiation had fallen through, or if he did I cannot remember them. During the time of this negotiation Mr. Quincy owed me either twenty-eight thousand, thirty-eight thousand, or fifty thousand dollars.

### Deposition of Josiah Quincy, Jr.

March 6th, 1851, April 2d, 1851, May 22d, 1851, and May 29th, 1851, I wrote the several letters to John H. Peck of Burlington, Vermont, copies of which are annexed, marked A, B, C

and D, respectively, and sent them to him by due course of mail.

I have no recollection of giving Mr. Peck, after the 6th of March, 1851, any order for borrowing money for the Vermont Central Railroad, except what is contained in my letter of that date.

By reference to my letter of April 2d, I am convinced that I received a letter from Mr. Peck, dated March 31st, 1851, which letter was placed on file and passed over to my successor. It has not been since in my possession. All that I can recollect about the transaction is from my letters.

The proposition, referred to in my letter of April 2d as being made by Mr. Peck in his letter of March 31st, was in reference to a loan of one hundred thousand dollars, I think. I cannot tell what my telegraphic reply was. I have no recollection of having renewed verbally to Mr. Peck the offer contained in my letter of March 6th, 1851, and I presume from my letters that I did not. I do not recollect who the gentleman was, who is referred to in my letter of May 22d, 1851. I do not recollect that Mr. Holbrook was the person referred to. I do not know why the negotiation was not carried out, except as stated in the letters.

### *Letter A, referred to.*

This letter is the same which was attached to the first deposition of John H. Peck, see *ante* p. 131.

### *Letter B, referred to.*

"Boston, April 2, 1851.

"John H. Peck, Esq., Burlington, Vt., — My dear sir:

"I answered yours of the 31st ultimo by telegraph this morning.

"As I can get money at nine and one-half for six months, about as fast as I want it, I decline the proposition.

'The money market is growing easier and I am not inclined to submit to very extravagant rates, except occasionally on demand.

"The receipts for February gave great satisfaction, and we hope to realize the truth of your anticipations as to the success of the road.

"Asking to be remembered to your lady, I am, very truly yours,

"JOSIAH QUINCY, JR., Treas., &c."

*Letter C, referred to.*
                              " Boston, May 22, 1851.
" John H. Peck, Esq., Burlington, — My dear sir :

" I was very much surprised at the inquiries that were made of me as to one hundred thousand dollars of my paper by a gentleman who said it was offered him by a person in Troy. I write to state that I consider that negotiation at an end, as nothing has been said about it for weeks. It was based upon the understanding that it should be done at once and privately, and not that the person should hawk the paper about and sell it before it was given.

" I consider it to have been a most unfortunate transaction for the credit of the company, and hope you will at once notify your correspondent that the negotiation is at an end.

        " I am, in haste, very truly,
                        " JOSIAH QUINCY, JR., Treas."


*Letter D, referred to.*
                              " Boston, May 29, 1851.
" John H. Peck, Esq., Burlington, Vt., — My dear sir :

" I consider the propositions discussed in April have long since been withdrawn, and I must again request that no propositions should be for a moment entertained on such a basis, as the offer of high rates of interest have an injurious effect on our negotiations.

" I am offered large amounts at eight per cent. for six months, and refuse it, as I am satisfied it can be soon obtained at a lower figure.

" With thanks for your endeavors, I am, very truly yours,
                        " JOSIAH QUINCY, JR., Treas."


*Letter of John H. Peck,* (offered by the defendant).
                              " Burlington, 31st March, 1851.
" Hon. Josiah Quincy, Jr., Boston,— Dear sir :

" Shall I take fifty thousand dollars on six months, your note with Central bonds at sixty-five as collateral ; interest seven per cent., brokerage one-fourth per cent., commission for endorsing three per cent., making a fraction over one per cent. per month ?

The party in New York who negotiates it charges one-half per cent. per month for the six months, making the above three per cent.

"Telegraph me, on the receipt of this, your wishes.

"Truly yours,          JOHN H. PECK."

*Deposition of John H. Peck,* (taken by the defendants, read by the plaintiff).

I received from Josiah Quincy, Jr., of Boston, by mail, in due course after the date thereof, four letters, of which I think the copies hereto annexed, marked A, B, C, D, are correct copies.

I wrote a letter to Mr. Quincy, to which the copy annexed marked B, dated April 2d, 1851, or rather the original thereof, was a reply. That letter was dated on or about the 31st of March, 1851.

*Ques.* (by the plaintiff.) Does the letter of Quincy of 2d April, 1851, or yours to which that is a reply, refer to the loan to be furnished by Durkee?

*Ans.* No. They refer to fifty thousand dollars to be raised through Jonathan Sturgis, Esq., of New York.

Letter A referred to, is the one attached to his deposition first read, *ante* p. 131. Letters B, C and D referred to, are those similarly marked and attached to the deposition of Josiah Quincy, Jr., *ante* p. 136, 137.

*Second deposition of H. M. Holbrook,* (taken by the plaintiff in answer to interrogatories).

*Ques.* Did you have any negotiation with Harrison Durkee of New York in May, 1851, for the loan of one hundred thousand dollars to the Vermont Central Railroad Company for whom he professed to act? If so, state the particulars as nearly as may be, and all that occurred relating thereto.

*Ans.* I think it was in the month of May, A. D. 1851, that I did have some negotiation with a Mr. H. Durkee, whom I presume to be Harrison Durkee, in the city of New York, regarding the loan of one hundred thousand dollars. The substance of the conversation, my impression is, was to the effect that I would discount notes of the Vermont Central Railroad Company to the

amount of one hundred thousand dollars, payable, or divided into notes payable in five, six, seven, eight, nine, ten, eleven and twelve months, at the rate of seven per cent. per annum, said notes to be endorsed by Josiah Quincy, Jr., and secured by the Vermont Central Railroad bonds, in an amount that should be satisfactory to me; one of the notes might have been payable in thirteen months, but of that I am not sure. I was to pay this, that is, for the proceeds I was to pay in over-due debts against Charles Durkee to the amount of some nine or ten thousand dollars, and the balance in cash.

Several letters passed between Mr. Durkee and myself in reference to this, one of which was dated May 24, 1851. Subsequently to that I saw Mr. Durkee in Boston and had further conversation with him in reference to the subject.

*Ques.* Please state why the negotiation contemplated in said letter was not completed? *Ans.* I don't know that I am able to say definitely. It may have been from remissness on Mr. Durkee's part, or on my part, or that the securities were not fully satisfactory to me. My recollection is not distinct upon that point. After my first conversation with Mr. Durkee I had some conversation with Mr. Quincy regarding the notes, by way of inquiry. I wished to know if there was any mistake in the notes. His reply was to the effect that if I could get them, or if they were out, he presumed there was no mistake as to their genuineness, and as to their being issued by authority.

*Ques.* Was the supposed remissness on the part of Mr. Durkee in not furnishing the notes, or the collaterals? *Ans.* I cannot say. I think that previously to my note of the 24th, Mr. Quincy either wrote me or told me that there were not any such notes out; that he did not know of any such notes out that I could get. I think he wrote me " that upon reflection he did not know that there were any such notes out as I had spoken to him about."

*Ques.* Would the letter of May 24th, accepting the proposition, have been written if that notice from Mr. Quincy had come previously? *Ans.* It may have been with the impression that Mr. Durkee had other notes, or notes already created.

*Ques.* Was Mr. Durkee able to furnish you with any such notes or security when the negotiations were broken off? *Ans.* I cannot say.

*Ques.* Do you know the customary brokerage for negotiating such loans? *Ans.* I think that the charge here is one-quarter per cent.

*Cross-examination.* At some time I stated to Mr. Quincy the rate at which I was to discount the paper, and I think it was at my first conversation with him. Mr. Durkee never tendered to me the notes. I would state that I think it was before the 24th May, and previous to Mr. Durkee coming to Boston that I told Mr. Quincy.

————— ————, for the plaintiff.

*Roberts & Chittenden,* for the defendants.

The opinion of the court was delivered by

Redfield, Ch. J. I. In regard to the proof offered to establish telegraphic communications, it seems to us that where such communications are relied upon to establish contracts, where their force and effect will depend upon the terms used, they must be proved in the same manner other writings, as letters and contracts, are. For a telegraphic communication is ordinarily in writing, in the vernacular, at both ends of the line, and must of necessity be so at the last end, unless the person to whom it is addressed is in the office at the time, which is sometimes the fact. In such case, if the communication were never reduced to writing, it could only be proved, like other matters resting in parol, by the recollection of witnesses in whose hearing it was repeated.

In regard to the particular end of the line where inquiry is first to be made for the original, it depends upon which party is responsible for the transmission across the line, or in other words, whose agent the telegraph is. The first communication in a transaction, if it is all negotiated across the wires, will only be effective in the form in which it reaches its destination. In such case inquiry should first be made for the very dispatch delivered. In default of that, its contents may be shown by the next best proof. If the course of business is, as in the cities, to preserve copies of all messages received in books kept for that purpose, a copy might readily be obtained which would ordinarily be

regarded as better proof than the mere recollection of a witness. And according to the early English and the American practice, the party is bound to produce a copy of the original, (that being lost,) when in his power, and known a sufficient time before the trial to enable him to do so ; 1 Greenleaf Ev. sec. 84, and note.

And perhaps if no copy of such message is preserved, but the original message ordered to be sent is preserved, that should be produced, although this were not strictly the original in the case, the letter delivered, which was the original, being lost.

But where the party to whom the communication is made is to take the risk of transmission, the message delivered to the operator is the original, and that is to be produced, or the nearest approach to it by way of copy or otherwise.

II. In regard to the merits of the claim, more than one question is raised.

1. It is said there is a fatal variance between the declaration and the proof. But it seems to us the amended count must be regarded as sufficient. The only objection raised against its sufficiency is in describing the commission as being payable upon such amount of money as the plaintiff should negotiate the loan for, when the contract proved is for the negotiation of a loan for the full sum of one hundred thousand dollars. But even in that view the commission, as it seems to us, is well enough described, as upon the amount negotiated, or to be negotiated, or which should be negotiated. In either form of expression it is but another mode of expression for one hundred thousand dollars.

2. It is said the proof did not tend to show a loan of the full sum, as Durkee's debt was to be accepted for a portion. But as this was to be cashed at the time of the negotiation by the plaintiff, it was substantially, so far as the defendants are concerned, a cash transaction. And as the defendants declined absolutely to go forward with the contract, and there is no pretence that the plaintiff expected the defendants to take any thing but money, it seems to us the plaintiff should not be deprived of reasonable compensation for his trouble on this ground.

3. But it is said it was not a loan in the sense of the authority given to Peck by Quincy. But it seems to us it was substantially such a transaction as Quincy probably contemplated in his letter

to Peck of the 6th March, 1851.   As he made no limit in regard
to the discount, it is fair perhaps to conclude that he expected
some discount.   And as he left this altogether to Peck, the con-
tract in that respect will bind the defendants.

And as Quincy offered to secure the loan by his own note, with
the bonds of the defendants or the stock of the Vermont and
Canada Railroad as collaterals, or the notes of the company, with
his own endorsement, it seems to us he must have expected very
much such a loan as the plaintiff negotiated with Holbrook, calling
it all money.   Quincy's chief objection to it, judging from the
correspondence, seems to have been the noise and stir made.

4. It is said the fact that the discount was to come out of it, and
that the full sum in money was not to be paid to the defendants
will destroy the identity of the contract.   But this, we think, will
depend upon the course of doing business.   And that whether the
discount and commission should be deducted, or not, if done
according to the usual course of negotiating similar transactions
at the time and in the place where this was done, it will answer
the contract.

5. It was said that taking all the testimony together it would
rather seem that Holbrook was not ready to make any loan.   But
there was a conflict of testimony on this point, and the plaintiff
might properly insist upon going to the jury in regard to it.

6. It seems that in certain kinds of brokerage in England, by
commercial usage, the broker is not entitled to his commission if
those who employ him decline to close the transaction after the
broker has been at expense to prepare for the negotiation, and
that in such cases the broker is entitled to no compensation.   We
suppose of course that a broker is not entitled to his full commis-
sions, probably, unless he completes the negotiation.   And in some
business, in some countries, there may be a custom or usage that
unless they earn their commission by completing the negotiation
they are not to be paid anything.   This is only giving those who
deal with brokers the right to recede from the negotiation until the
last moment.   If such a right is reserved, either expressly or by
the known usage of a particular business, which is in effect the
same thing, it is all well.   There is no injustice in such a rule as
applicable to contracts.   But we are not aware of any such usage

in regard to brokerage in this country. If any such exists, the party might prove it probably before the jury, and thus obtain the benefit of it. The court could not declare it as a rule of law unless it became notorious and universal.

7. It does not appear to us very obvious that the security which Peck agreed to give the plaintiff differs substantially from that named in Quincy's letter to him. In the one it is said to be at " a fair rate," and in the other, to the plaintiff's satisfaction, which, if the plaintiff is to be regarded as a fair man, must import much the same thing.

8. It is said that it does not appear from any of the evidence, giving it the most favorable construction for the plaintiff, that he was ever fully ready, or that any one with whom he had negotiated was fully ready to have transacted a loan of one hundred thousand dollars with the defendants upon the terms specified. But if the plaintiff proceeded with reasonable dispatch in the matter and the negotiation was revoked by the defendants, and they peremptorily refused to go forward and complete the contract, it would certainly not be necessary for the plaintiff to show full readiness on his part, unless that were important to the identity of his claim as described in the declaration. And we do not well perceive how it could be made so, as if the plaintiff averred full readiness on his part, and that the defendant refused to complete the contract, and proved part readiness and that his authority was countermanded, it would not show a case of variance, but only of an averment beyond the proof, but in the same direction. One may always, in such case, recover to the extent of the proof. If the party do all in his power to be ready until his authority is revoked, he may well say he was ready, and the other party refused to accept performance.

Judgment reversed and case remanded.