Pepper *v*. Telegraph Company.

(*Jackson.* May 7, 1889.)

1. Telegraph Companies. *Negligent alteration of abbreviated telegram. Measure of damages. Due care and diligence.*

Telegram expressed in abbreviations understood by the transmitting company is not a "cipher dispatch;" and for negligent alteration thereof the company is liable to the sender for such damages—whether capable of being accurately foreseen or not—as resulted naturally and proximately from its default, and could not have been averted by due care and diligence of the sender. And the Court will not be very critical in examining the expedients adopted by the injured party, in good faith, to avert loss; and will impose upon the negligent company the burden of showing want of due care and diligence.

2. Same. *Same. Sender not bound by alteration. Agency.*

Sender of telegram, altered in its transmission, is not bound to the receiver who accepts it according to its altered terms. The telegraph company has no power to bind the sender by any alteration of the message.

Cases cited and approved: 6 Ex. Ch. (L. R.), 7; 10 Ct. Sess. Cas., 35.

Cited and disapproved: 71 Ga., 760.

Cited and distinguished: 31 Minn., 481; 3 Abb. Pr. Reps. U. S., 408; 35 Barb., 463; 40 Wis., 431; 29 Vt., 127; 35 Penn. St., 298; 48 N. H., 487; 25 Kan., 410; 25 Ill., 591; 82 Ill., 73; 37 Miss., 682; 91 Ill., 298; 50 Vt., 316; 59 Ill., 58; 54 Md., 138.

3. Same. *Same. Contract limiting liability for negligence invalid.*

The doctrine, enunciated in *Marr* v. *Telegraph Company*, 85 Tenn., 529, that a telegraph company can not limit its liability for damages caused by its negligence in transmission of messages, is re-affirmed.

4. Same. *Same. Defeating sale. Measure of damages.*

Where sale effected by telegram is discovered, after delivery of goods, to be invalid by reason of the negligent alteration, by the telegraph company, of the seller's message, whereby the price was reduced, the company is liable to the seller for the difference between the real value of the goods and that price which the seller, by the exercise of due diligence, should, under the particular circumstances, have

received. The difference between the prices named in telegram as sent and as delivered is not ordinarily the true criterion of damages in such case.

5. SAME. *Same. Same. Same.*

But the difference between the prices named in telegram as sent and as received may be taken as basis of company's liability, where there is no evidence in record to show that such basis is unreasonable or unjust.

6. SAME. *Same. Case in judgment.*

A proposed, by telegram, to sell B goods at a specified price. By negligence of telegraph company the proposition was changed so as to reduce price $75. B accepted the altered proposition. A delivered and B accepted the goods in ignorance of the alteration. The company had limited its liability to price paid for message. There was no proof to show a more equitable criterion for damages than the difference between the prices named in telegram as sent and as received.

*Held :* That telegraph company was liable to the sender of the telegram for $75—the difference between the prices named in telegram as sent and as received—there being no proof showing any better or more equitable basis.

---

### FROM SHELBY.

---

Appeal from Chancery Court of Shelby County. B. M. ESTES, Ch.

CRAFT & CRAFT for Complainants.

TURLEY & WRIGHT for Respondent.

FOLKES, J. This is a suit by complainants to recover damages for a breach of a contract to

deliver correctly a certain telegram entrusted to defendant as the owner and operator of a telegraph line.

The facts necessary to a correct understanding of the case are as follows:

On October 5, 1886, R. F. Bugg & Co., produce brokers at Birmingham, Ala., sent by defendant company to complainants, who were produce dealers at Memphis, this telegram: " Quote cribs loose, and strips packed." Thereupon complainant wrote out upon the usual printed blanks of the defendant company, and delivered to the proper agent of the defendant for transmission, this reply, addressed to Bugg & Co. at Birmingham, " Car cribs six sixty, c. a. f., prompt." The word " cribs " meant in the meat trade clear ribs, and c. a. f. meant cost and freight. These terms were well understood in the trade, and by the defendant.

This telegram, as delivered by the company to Bugg & Co., read " six *thirty* " instead of " six *sixty*," being in other respects correct.

Thereupon Bugg & Co. ordered a car load of the meat, amounting to twenty-five thousand pounds.

Complainants shipped the meat, and drew on Bugg & Co. for $1,650, the price of the meat at six sixty. Bugg & Co. refused to pay the draft, relying on the telegram as received by them, and complainants accepted of them $1,575, the value of the meat at the price of " six *thirty*," making a loss to complainants of $75.

Complainants at once notified the company of

Pepper *v.* Telegraph Company.

the mistake, and that the same had entailed upon them the loss of $75, and demanded payment of this sum, which the company declined to make.

The defendant, in its answer, says it is not liable—

*First.*—Because the telegram in which the error occurred fails to give any idea as to its true meaning, whereby defendant was unable to judge of its importance; that it can only be held liable for damages which it might reasonably have contemplated as a result of its error; " that it is not responsible for results flowing from a mistake in the transmission of such cipher dispatches."

*Second.*—That the dispatch not being repeated their liability is, by the terms of the printed blank, which is the contract, limited to the cost of the telegram.

*Third.*—That in no event are they liable for the difference in the price contained in the telegram as received by it, and the price in the message as delivered by it to Bugg & Co.—*i. e.*, between $6.60 per hundred pounds and $6.30, claiming that complainants could have recovered their meat from Bugg & Co. as it was shipped in consequence of said mistake.

There was judgment for the complainants for the sum of $75, with interest from the date of the delivery of the meat.

Defendant has appealed, assigning errors.

It is unnecessary for us to determine what is the measure of damages for error, in the transmission of a telegram written in cipher, a question

upon which the authorities are not in harmony, and one where there are very many nice distinctions and refinements.

The telegram before us is in no sense in cipher. It is an abreviation merely, and from the proof in the cause an abreviation known to the company. It fully apprised the company that a proposition to sell clear rib meat in car load lots at $6.60 per hundred pounds was made, and the company could reasonably have anticipated that if the proposition was accepted, the writer of the message would forward the goods in expectation of such price, and that his loss, if there was an error in delivering the message by the negligence of the company, would be the difference between the real value of the goods and the price at which the sender, in the exercise of reasonable prudence, might be able to dispose of them when rejected by the proposed purchaser in consequence of the error. In other words, the company knew that carelessness, or mistake, in the delivery of the message might expose the sender to pecuniary loss, the amount or extent of which it was not necessary for it to know. "It is only necessary that the damages be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is such as might naturally be expected to follow its violation," and it was only necessary for the company to know that the telegram related to a matter of business which, if improperly transmitted, might lead to pecuniary

loss, upon the basis above suggested, to be increased or diminished according to the particular circumstances of the case, and to be determined upon the rule of compensation to the party injured.

The second matter of defense set up in the answer, predicated upon the terms of the special contract contained in the printed blanks of the company, need not be noticed since the case of *Marr* v. *Western Union Telegraph Company*, in 1 Pickle, 529—which settles in this State, in accord with the overwhelmning weight of authority, that such stipulations will not avail the company where the damage has resulted from the negligence of its agents or officers.

The mistake, or error, here is clearly shown to have been occasioned by such negligence. Indeed, learned counsel for the company have not made any contention to the contrary in this court.

This brings us to the consideration of the third and serious ground of defense, the measure of damages in this particular case.

The contention of the counsel for complainants is, and such was the view of the learned Chancellor, that the company was the agent of the complainants as the sender of the telegram, and that the complainants were therefore bound to let Bugg & Co. have the goods at $6.30, the price erroneously named in the dispatch as delivered; and that the loss must be measured by the difference between the price at which they were willing and expected to sell, and the price which, in con-

sequence of the error of such agent, they were compelled to sell.

In our opinion this contention cannot be maintained, either upon principle or authority.

The minds of the party who sends · a message in certain words, and the party who receives the message in entirely different words, have never met. Neither can, therefore, be bound the one to the other, unless the mere fact of employment of the telegraph company, as the instrument of communication, makes the latter the agent of the sender. Upon what principle can it be said such an agency arises? The telegraph company is in no sense a private agent; it is clothed by the State with certain privileges—it is allowed to exercise the right of eminent domain. In exchange for such franchises it is onerated with certain duties, one of which is the obligation to accept and transmit over its wires all messages delivered to it for that purpose. The parties who resort to this instrumentality have no other means of obtaining the benefits of rapid communication, which is the price of its existence. They have no opportunity, and no power, to supervise or direct the manner or means which the company use in the discharge of their duties to the public, in the transmission of messages for particular individuals. They can only deliver to the company a legible copy of what they wish communicated, with no expectation that such paper is to be carried to the party addressed; and their connection with the company there and then ceases.

They have contracted with the company to transmit the words of the message to the party addressed, through its own agents and with its own means. The party receiving the message knows that he is not obtaining any communication direct from the sender, but that he is receiving what the company has taken, and changed the form of, from the paper on which it was written, transmitted by electricity over the wires of the company, and reduced to writing at its destination by an agent of the company; and that it only represents *what was written* by the sender, in the event that there has been no imperfection in the mechanism of the company, nor negligence in the servants of the company. Knowing the scope of the employment, and the methods of transmission, the receiver should be held to know that the sender is bound by the contents of the telegram as received only so far as it is a faithful reproduction of what is sent. He knows, furthermore, that if he acts on the telegram, and it should turn out to have been altered by the negligence or wrongful act of the company, the latter is liable to him for such injury as he may sustain thereby.

Ordinarily there is no relation of master and servant between the sender of the telegram and the company. Where this relationship does not exist the principal is not responsible for the torts of the agent, and the negligent delivery of an altered message, when acted on by the receiver to his detriment, is a tort, for which the telegraph company alone is responsible.

35

The company retaining exclusive control of the manner of performance, and of its own employes and instrumentalities, the sender of the message being absolutely without voice in the matter, it seems to us that the position of the company to its employer is that of "independent contractor," as defined and understood in the well-settled class of cases where the employer is held to be not responsible for the negligence of the contractor in the performance of his work or undertaking.

The many and marked differences between the employment of such companies to transmit a dispatch, and the employment of a private person to deliver a verbal message, are so manifest that we cannot assume the liability of the sender in the first instance, from his conceded liability in the last, for the negligence of the instrumentality employed.

Such a holding not only does violence to well-settled principles of the law of agency, but may lead to the absolute ruin of the party employing this useful and now necessary public medium of rapid transmission of intelligence, so that every consideration of public policy would seem to point to a different result, unless the courts find themselves constrained, by the great weight of authority, to uphold the contention here made.

How are the authorities?

In England and in Scotland the idea of agency in the company so as to bind the sender upon a telegram negligently changed in the transmission is repudiated. *Henkel* v. *Pope*, L. R. 6 Exch., 7;

*Verdin* v. *Robertson*, 10 Ct. Sess. Cas. (3d Series), 35.

Mr. Gray, in his work, while stating the law to be in England and Scotland as above, says that in this country the rule is in general otherwise, citing a number of cases in Note 3 to § 104.

It is to be noticed, however, that. this author, after making the statement above given, throws the weight of his learning and research against what he says is the tendency of the American Courts, and in an instructive discussion of the question seems to demonstrate that the English rule is the correct one.

It is also worthy of remark that, in the note already referred to, he follows the citation of the cases which are said to make the American rule with the statement that, "as a matter of fact, it has been decided *in a single instance only* (*Western Union Telegraph Company* v. *Shotter*, 71 Ga., 760) that the receiver of an altered message is entitled to hold the sender responsible upon its terms," adding, "that the principle which would allow him to do so, however, has been considered in the other cases."

Let us see what may be briefly said of the other cases.

In *Wilson* v. *Minn. & Northwestern Railroad Co.*, 31 Minn., 481, it is apparent, from pages 482–3 of the opinion, that the question of agency was really not involved.

With *Rose* v. *U. S. T. Co.*, 3 Abb. Pr. Reps.

U. S., 408, we content ourselves with what Mr. Gray says of this case. "It seems to affirm that the employer of a telegraph company is responsible upon a negligently altered message, but it does not necessarily determine the question.

The case decided that the plaintiff, who was the agent of the sender of a message, altered through the negligence of the defendant, could not maintain an action against the defendant for the injury sustained through acting upon that alteration.

"The decision was rested upon the ground that the plaintiff had sustained no injury through the act of the defendant, since he had a perfect remedy for his loss against the sender of the message. The ground of this decision is open, perhaps, to objection." See § 78.

Continuing, the author says, "Assuming its sufficiency, it may be urged that the case in reality decided only that the employer of a telegraph company is responsible upon a negligently altered message where the relationship of principal and agent exists between him and the receiver of that message—a decision which does not determine the question under consideration."

*Dunning* v. *Roberts*, 35 Barb., 463, is of little weight. The case decided simply that the defendant was responsible upon a message which was unquestionably correctly transmitted and delivered—although it was not the one that he wished sent—upon the ground of the relationship of principal and agent existing between himself and the actual

sender of the message. The latter, moreover, in the absence of the operator of the company, telegraphed the message himself, so that no contract at all was made between the telegraph company and the defendant."

In *Saveland* v. *Green*, 40 Wis., 431, there was no question of a mistake in the dispatch; the only question was whether the telegram received, where no mistake was claimed, was to be treated as the original, so as to make it competent evidence of the contents of such telegram.

*Durkee* v. *Vermont Cent. R. R. Co.*, 29 Vt., 127, decides that the original, where the person to whom it is sent takes the risk of its transmission or is the employer of the telegraph company, is the message delivered to the operator, but where the person sending the message takes the initiative so that the telegraph company is to be considered as his agent, the original is the actual message delivered at the end of the line. In this case there was no question of mistake, nor of the sender being bound thereby, but merely a controversy as to what was original, and what was secondary evidence of the contents of a telegram.

Moreover, if this case decides anything pertinent to the case at bar, it is that as Bugg & Co. first invoked the services of the telegraph company, inviting a reply from complainants through the same medium, the company in such case was the agent of Bugg & Co., not of complainants, so that the

latter would not have been bound by the negligence of the company.

*N. Y. & Wash. Pr. T. Co.* v. *Dryburg*, 35 Penn. St., 298, is a case were the receiver of an altered message, who had suffered injury thereby, was allowed to recover against the telegraph company as for a tort. If the telegraph company is the agent of the party who sent the telegram, then we are unable to see how the receiver actually suffered injury in this case, because if the sender of the telegram was bound to make good to the receiver the contract as reported in the altered message according to its terms, then the party addressed could have recovered of the sender the value of the two hundred bouquets called for in the altered message instead of two bouquets.

What is said in this case as to agency of the company so as to bind the sender is pure *dictum.*

*Howley* v. *Whipple*, 48 N. H., 487, the next case cited by Mr. Gray in the note referred to, so far as it touches the question now under consideration, is a mere *dictum,* and it would be uninstructive in this connection to state what it really does decide. The character of the question before that Court may be inferred from a quotation which the opinion makes from § 340–1 of Scott & Jarnagin on Telegraphy, adding that "many cases are cited in the above work, from which it is held that in all controversies between the sender of the message and the company, the original message is the one left at the office by the party sending it. But where

a man sends a proposition to another by telegram, and gets a reply accepting the offer, the original message, so far as binding the acceptor is concerned, is the one delivered to him at the other end."

So of *Barous* v. *Brown*, 25 Kan., 410; *Matteson* v. *Noyes*, 25 Ill., 591; *C. & St. L. R. R. Co.* v. *Mahoney*, 82 Ill., 73; *Williams* v. *Brickle*, 37 Miss., 682; *C. & I. R. R. Co.* v. *Russel*, 91 Ill., 298; *State* v. *Hopkins*, 50 Vt., 316. They relate alone to the question of original and secondary evidence, so far as they touch directly or indirectly upon the matter now under consideration.

*Morgan* v. *People*, 59 Ill., 58, was where the plaintiff in an execution telegraphed to the Sheriff to hold up the sale contemplated thereunder. The Sheriff refused to obey the telegram, and was sued for damages by the owners of the property. It was held that the telegram delivered to the Sheriff was the original, and that he should have obeyed it. There was no alteration or mistake in the telegram.

*Smith* v. *Easton*, 54 Md., 138, was this: Smith & Whitney, who were creditors of W. H. Easton, determined to attach his property to secure their debt. It was agreed, however, that he might telegraph to his brother, J. T. Easton, in New York, and that all parties would await the reply. W. H. telegraphed to J. T. as follows, " Smith & Whitney are here, and will attach if not secured." He received a reply saying, " Will endorse your

Smith & Whitney note—three months." Smith & Whitney took the note of W.. H. Easton at three months in satisfaction of their claim, and sent it to J. T. Easton, in New York, for his endorsement, which was refused. Thereupon they sued him, and introduced the telegram that was received by W. H. Easton, upon which they had acted. The Court held that the telegram received was not evidence of a liability upon J. T. Easton, but that the message written by J. T. should have been introduced or accounted for.

This certainly decides nothing to support complainant's contention here. On the contrary, the logic of it would seem to be adverse to the idea of agency in the company, for if the company was the agent of the sender when it delivered the telegram, the telegram, as delivered, was the act of the principal, and ought to bind him.

We have devoted more time and space to these cases than might appear to be necessary, but as they are summed up in the note referred to by Mr. Gray as the cases that are regarded as making what is called the rule in America, it was deemed not out of place to ascertain what they were. We make and have no criticism upon what these cases do decide, we merely say that they are not authority upon which to predicate the claim that the courts in this country have established or settled the question under consideration. As already stated, Mr. Gray not only shows that upon principle the English holding is the correct

one, but, while listing the cases above mentioned as indicating a contrary view, he states that most of them are *dicta*.

There is but one case referred to by him, and the industry and learning of counsel have produced no other, which directly adjudges that the sender of a telegram is bound to the receiver by the terms of the message as negligently altered by the Company. That is the case of *Western Union Telegraph Company* v. *Shotter*, 71 Ga., 760.

With very great respect for the high character of that learned tribunal, we cannot approve the line of reasoning pursued, nor the conclusion therein reached. The facts of the case present the question exactly in the shape, and under the same circumstances, which we have in the case at bar. The learned judge delivering the opinion places his conclusion in part on the fact that in England the government has charge of the telegraph lines, and upon the idea that a merchant, or business man, would lose credit and commercial standing were he to refuse to make good to his correspondent the contract contained in his message as delivered. We cannot see how the fact of governmental charge of the telegraph system can make any difference, for in this country the sender is as impotent to control and direct the movements and conduct of the telegraph company as if it were under the government, while in no sense can the company be said to be a bailee or carrier of the particular message.

Nor can we see how the commercial standing of the sender, who remits his correspondent to his recourse on the telegraph company for such injury as may result from the erroneous message, can be effected.

The Georgia case, however, while holding that the sender was bound to let the receiver have the goods at the reduced price stated in the erroneous message, decides that the sender is not entitled to recover from the company as damages the difference between the price as written by the sender and that delivered by the company, upon the ground that there was no evidence that the purchasers, at the points where the telegrams were received, would have given the price at which the goods were offered in the correct telegrams, nor what was the market value of the goods at the place to which they had been shipped in consequence of the error, the Court holding that the measure of damages in such case was "the difference between the price offered by the error of the telegram and the market value at the point to which shipped—that is, what the seller could have gotten there."

This case, therefore, though holding as stated concerning the idea of agency, is opposed to the conclusion of the Chancellor in the case at bar on the measure of damages.

Being of opinion, then, that the complainants were not bound to let Bugg & Co. have the goods at the price erroneously communicated by the tele-

graph company, but that it was their privilege to have reclaimed them when Bugg & Co. refused to pay the price as written by complainants, let us see what were their rights and duties, and what is the criterion of damage in such a case. They were bound to have taken just such steps as a reasonably prudent man would take to save himself had the mistake or error been his own.

A man, under such circumstances, is not to be held to have done the wisest and best thing, but to the exercise of reasonable skill and diligence. Whether he so acted or not is a question of fact to be left to the jury, under proper instructions by the Court, in a jury case, and for the Court to try as any other question of fact in Chancery or non-jury cases.

What would be prudent in one case might be very unwise in another, dependent on the character of the goods, the market value in the place to which sent by the mistake, or the value at the place from which sent, regard being had to storage, expense of selling, handling, freights, depreciation of perishable goods, and fluctuations in the market, etc.

For instance, in one case it might occasion less loss to sell at the price named in the message as erroneously delivered, where the cost and risk of storage and selling on that market would be heavier than the difference in the price as sent and the price as received, or the cost of returning the goods where the freight both ways might be more

than such difference. Where the difference in the price as sent and the price as erroneously delivered was greater than would be the cost of such retaining and selling there with freight one way, or greater than returning with freights both ways, regard being had to the markets at the two places, then he ought not to sell at price so named, but should retain or return, according to his best judgment.

In such cases the Courts will not be over nice, on behalf of the negligent company, in adjusting the scales to the wisdom of the several means open to the party injured, and undertake to weigh carefully the question as to what was best as then appeared, and certainly not as to what was best as seen in the light of subsequent events, but will merely require the victim of the negligence to act in good faith, in the exercise of ordinary prudence, in the effort to extricate himself from the situation in which he has been placed.

Where this has been done, the loss resulting will be the measure of damages which he will be entitled to recover, upon the doctrine of compensation.

It is manifest that it would be unreasonable to expect the same conduct in a case where the goods shipped in consequence of the negligence of the company were lumber, coal, or the like, where freights would be a large factor in the loss, and in a case where the goods were bonds, diamonds, and the like, where freights are insignificant compared with value; such considerations, together with

the facilities for sale, proximity to other markets, and the like, are to be regarded in connection with the facts and circumstances of each particular case.

This is a summary of the result of general principles, all of which are too well settled to require citation of authority.

Applying these principles to the case at bar, we find no proof in the record that would enable us to ascertain the damages fairly resulting from the negligence of the telegraph company. There is nothing to show what was the market value of the meat at Birmingham, nor at Memphis, unless the telegram, as written by the senders, is to be considered as fixing it. This is evidence of what the sender was willing to take for it, and in the absence of proof to the contrary, may be said to furnish evidence of the market value in favor of the party making the offer as against third parties. There is no proof as to freight either way, so that we cannot say whether the complainants have acted prudently in selling at the price named in the erroneous telegram, or whether he should have sought other purchasers at Birmingham, or recalled the meat to Memphis, or taken some other course. In the absence of some such proof it is impossible for the Court to ascertain the extent of the injury inflicted by the company's negligence, so as to fix and determine the compensation therefor with certainty.

But the negligence being established, and the complainants having shown that they disposed of

the goods at the price named in the erroneously delivered message, which was one of the means open to the shipper of extricating himself with the smallest loss, and there being no proof whatever tending to show that such disposition of the goods was not the very best thing to be done under the circumstances, we are of opinion that the difference between the price named in the telegram as sent and as delivered, where sale is actually made at the latter price, may be taken as the correct measure of damages where, as in the case at bar, the difference is not so great as to excite suspicion, and where, from the character of the goods, it does not appear unreasonable and improper to make such disposition of the goods. Where the conduct of the party injured, in his effort to extricate himself from loss, does not appear to have been improvident, nor in bad faith, and the loss is shown from such conduct, the burden of proof is upon the author of the wrong to show that the loss might have been mitigated by a different course of conduct, which a reasonably prudent man ought to have taken. In the absence of such proof the loss, as shown, will be taken as the correct measure of damages in the particular case. Of this the wrongdoer certainly cannot complain, the fault being his that there is not proof that some other course of conduct would have lessened the damages.

Let the decree be affirmed with costs.