HERBERT HOLTZ *vs.* WESTERN UNION TELEGRAPH COMPANY.

Essex.    October 11, 1935. — June 29, 1936.

Present: RUGG, C.J., PIERCE, FIELD, LUMMUS, & QUA, JJ.

*Telegraph Company. Carrier,* Of intelligence. *Agency,* What constitutes, Independent contractor. *Contract,* Performance and breach. *Damages,* For breach of contract. *Proximate Cause.*

A telegraph company in transmitting a message is not the agent of the sender, but is a public service corporation subject to duties and liabilities incident to those of a common carrier of intelligence for hire and is an independent contractor; and as between the sender and the addressee the sender is not bound by the company's error in transmission.

Incorrect transmission by a telegraph company of a message quoting a selling price for goods, whereby the addressee in a distant State accepted a lower price than that stated in the message as given to the company, received shipments at the lower price, and, though urged by the seller, refused to return the goods or to pay the higher price, and the seller, rather than litigate against the buyer respecting the transaction, accepted payment of the lower price, warranted a finding that substantial damage to the seller was a proximate result of the company's breach of its contract with him, and did not require a finding that he had failed to mitigate the damage.

CONTRACT OR TORT. Writ in the Superior Court dated September 4, 1931.

The action was tried before *Hanify,* J.

*J. P. Cleary*, for the plaintiff.

*A. P. Hardy*, (*F. T. Iddings* with him,) for the defendant.

RUGG, C.J.   This is an action in contract or tort by the sender of an unrepeated night letter telegram to recover damages alleged to have been sustained by the incorrect transmission of the message.   The parties stipulated that, if there was any evidence which would justify a jury in finding for the plaintiff, damages were to be assessed for the plaintiff in the sum of $500.   The case is here on the plaintiff's exceptions to the trial judge's direction of a verdict for the defendant.

There was evidence tending to show the following facts: The plaintiff, a shoe manufacturer in Haverhill, had on hand shoes of a kind previously purchased from him by the Penn Shoe Company of Pittsburgh, Pennsylvania.   To that company the plaintiff wrote on a telegram form furnished by the defendant a message of this tenor: "WE HAVE ON THE FLOOR WHT KID REGENT STOCK SHOES BENNIES AND CHARLIES PRICE $1.75 NET ADVISE BY WIRE IF YOU CAN USE SOME."   It was received and charged for as an unrepeated night letter on June 25, 1931, at the defendant's Haverhill office.   It was delivered to the addressee in Pittsburgh the next morning, Friday, June 26, 1931, with $1.25 substituted for $1.75 as the price.   The word "WHITE" was also substituted for the letters "WHT," but this was not a material matter and nothing turns upon it.   The executive of the Penn Shoe Company handling this business knew the price of $1.25 per pair for shoes of that grade to be very substantially below the market price.   In fact, the fair market value at the time was $2.25 per pair.   Immediately upon receipt of the message the Penn Shoe Company wired for some of the shoes.   Ten cases, each containing thirty-six pairs, were ordered by it and shipped by the plaintiff to it on Friday, June 26, and arrived in Pittsburgh Monday morning, June 29.   A second order was sent on that same Friday afternoon and in response seven additional cases were shipped by the plaintiff on Saturday.   On Monday the Penn Shoe Company wired the plaintiff to ship all shoes of that kind in stock.   The

plaintiff shipped to it nine cases on Monday and a final shipment of nine cases on Tuesday, June 30. All of these orders of the Penn Shoe Company referred to the shoes specified in the first telegram sent to it by the plaintiff and none of the subsequent telegrams made any reference to the price. The plaintiff forwarded his invoice at $1.75 a pair with the first shipment. This invoice was received by the Penn Shoe Company on Monday, June 29. On that date the first two shipments were delivered to the Penn Shoe Company. The third shipment was delivered to it on July 1, and the fourth on July 2. On receiving the invoice at $1.75 per pair which accompanied the first shipment and which was received on Monday, June 29, the Penn Shoe Company wrote immediately to the plaintiff requesting a corrected invoice at $1.25 per pair. On receipt of this letter on July 1, the plaintiff communicated with the defendant's local office in Haverhill and found that the original message had been erroneously transmitted. On the same morning he telephoned the Penn Shoe Company and explained the error to one of its executive officers, who replied that he would pay only $1.25, the price quoted in the telegram received by it, and "This is the Western Union's error and we cannot pay you $1.75." The plaintiff then asked for a return of the shoes by the Penn Shoe Company, but was told that the entire lot had been sold and a substantial part of them already had been delivered. In due course the Penn Shoe Company paid the plaintiff $1.25 a pair. All the evidence has been set forth relating to what the plaintiff did in attempting (1) to procure the return of the shoes from the Penn Shoe Company and (2) to get that company to pay anything in excess of $1.25 per pair for the shoes.

On July 1, 1931, the plaintiff made formal demand in writing on the defendant for damages. The difference between the fair market value of the shoes and the price paid for them by the Penn Shoe Company amounted to $1,258. It was conceded by the plaintiff at the trial that under the defendant company's standard form of contract, and in accordance with the tariffs duly published by it and

properly approved by the Interstate Commerce Commission, both of which were introduced in evidence, this was an unrepeated night letter and the maximum damages which the plaintiff might recover in this action are $500.

There is conflict in the authorities as to the liability of the sender in case of mistake in the transmission of an offer or acceptance by telegram. It is held in some jurisdictions that a party making an offer by telegram is responsible for the correct transmission of his message and is bound by it in the terms in which it is actually delivered to the person addressed. This is on the theory that the carrier of the message is the agent of the sender. *Western Union Telegraph Co.* v. *Shotter*, 71 Ga. 760. *Des Arc Oil Mill* v. *Western Union Telegraph Co.* 132 Ark. 335. *Ayer* v. *Western Union Telegraph Co.* 79 Maine, 493. It is held in other jurisdictions that the telegraph company is in no proper sense a private agent of the sender of the message. The public character of a telegraph company, the special powers conferred upon it by government, the franchises enjoyed by it, and the nature of the service rendered by it, all tend to take it out of the class of ordinary private agents and to render it an independent contractor. Its business is affected with a public interest. Its methods of conducting its business are beyond the control of the sender of a message. Its rates and many of its activities and practices are regulated by public authorities. It selects its own route for transmission of messages. It was an interstate carrier transacting interstate commerce in the case at bar. In this particular it is subject to regulation by the Congress, whose power has been exercised. *Primrose* v. *Western Union Telegraph Co.* 154 U. S. 1. *Western Union Telegraph Co.* v. *Speight*, 254 U. S. 17. *Western Union Telegraph Co.* v. *Esteve Brothers & Co.* 256 U. S. 566. *Western Union Telegraph Co.* v. *Priester*, 276 U. S. 252. It is required to serve the public without discrimination. It is charged by law with the liabilities of a common carrier. It enjoys most, if not all, the privileges of a common carrier. It ought in reason to be responsible in proper cases to the receiver as well as to the sender of the message. All these

circumstances seem to us to lead to the conclusion that the relation of the sender of a message to a telegraph company cannot well be that of master and servant, or principal and agent. This point has never been decided in this Commonwealth before. Various cases have arisen here touching the respective rights and liabilities of the sender and the telegraph company. *Squire* v. *Western Union Telegraph Co.* 98 Mass. 232. *Clement* v. *Western Union Telegraph Co.* 137 Mass. 463. *Vermilye* v. *Postal Telegraph Cable Co. of Massachusetts*, 205 Mass. 598. *Wheelock* v. *Postal Telegraph Cable Co. of Massachusetts*, 197 Mass. 119. These decisions throw no light on the present controversy. We are of opinion that a telegraph company is not in any strict and proper sense the agent of the sender in transmitting a message, but is a public service corporation subject to duties and liabilities incident to those of a common carrier of intelligence for hire. This question was fully discussed with ample review of the conflicting authorities in *Western Union Telegraph Co.* v. *Cowin & Co.* 20 Fed. (2d) 103. It there was held in conclusion that "The sender of a message in nowise controls the service rendered by the telegraph company. The latter selects its own instrumentalities, its own particular employees, and its own methods for transmitting a message. The sender employs the telegraph company to deliver to the addressee of the message, not the original message filed, but a true copy thereof. Such being the character of a telegraph company and the nature of the service it renders, it logically follows that the relation between the sender and the telegraph company is not that of principal and agent in the usual sense of those terms but rather that of employer and independent contractor, that the telegraph company is authorized only to transmit the message filed by the sender, and that if it goes beyond that authority and delivers a message containing an offer in terms different from the original message filed by the sender for transmission, the latter is not bound by the offer as expressed in the erroneous message delivered." To the same effect are *Henkel* v. *Pape*, L. R. 6 Ex. 7; *Flynn* v. *Kelly*, 12 Ont. Law Rep. 440; *Pepper* v. *Western Union Telegraph Co.* 87

Tenn. 554; *Harper* v. *Western Union Telegraph Co.* 133 S. C. 55; *J. A. Shingleur & Co.* v. *Western Union Telegraph Co.* 72 Miss. 1030; *McKee* v. *Western Union Telegraph Co.* 158 Ky. 143; *Mt. Gilead Cotton Oil Co.* v. *Western Union Telegraph Co.* 171 N. C. 705; and *Strong* v. *Western Union Telegraph Co.* 18 Idaho,.409. See 1 Williston on Contracts, (Rev. ed.) § 94, and Notes in 42 Am. L. R. 293 and 54 Am. L. R. 1369, for collection of many authorities.

It follows that, since the defendant was not the agent of the plaintiff in the usual sense in transmitting the message of the latter to the Penn Shoe Company, but was an independent carrier of intelligence for hire, the plaintiff was not bound by the price of $1.25 per pair erroneously stated in the telegram as delivered by the defendant to the Penn Shoe Company instead of the price of $1.75 stated in the message delivered by the plaintiff to the defendant for transmission. The latter was the only price fixed or sanctioned by the plaintiff. The message as delivered by the defendant to the Penn Shoe Company was not the plaintiff's offer. The orders sent by the Penn Shoe Company did not complete a series of contracts between it and the plaintiff. The parties were never in agreement as to terms. The plaintiff was not bound to sell at the price contained in the telegram as delivered. It is not necessary to consider whether the message as handed by the plaintiff to the defendant constituted an offer. See *Smith* v. *Gowdy*, 8 Allen, 566; *Ashcroft* v. *Butterworth*, 136 Mass. 511; 1 Williston on Contracts, Rev. Ed. § 27; Am. Law Inst. Restatement: Contracts, § 25. If it be assumed to be an offer, that offer was not transmitted to the Penn Shoe Company. It never was accepted and never became a contract between the plaintiff and the Penn Shoe Company.

The evidence showed a breach of contract by the defendant in failing to deliver the message handed to it for transmission to the Penn Shoe Company. The plaintiff is entitled to recover such damages as resulted to him from that breach as a proximate cause. The plaintiff's contention is that he is entitled to recover the difference between the market value of his shoes and the price paid to him by

the Penn Shoe Company amounting to $1,258, but he concedes that, by reason of legal limitations upon the liability of the defendant, only $500 can be recovered.   He urges with reference to the breach of contract that, as the asking price of the shoes was stated in the telegram delivered by him to the defendant, the latter must be held to have had knowledge that a particular damage would result if the message were erroneously transmitted.   The plaintiff is at least entitled to nominal damages.   *Hagan* v. *Riley*, 13 Gray, 515, 516.   *McNulty* v. *Whitney*, 273 Mass. 494, 504.   *Pacheco* v. *Medeiros*, 292 Mass. 416, 422.   *Leshefsky* v. *American Employers' Ins. Co.* 293 Mass. 164, 172. Am. Law Inst. Restatement: Contracts, § 328.   It was or might have been found to be the natural result of the breach of contract by the defendant that the plaintiff should ship his goods on orders from the Penn Shoe Company.   That company had some of the plaintiff's shoes in Pittsburgh, Pennsylvania, before the plaintiff learned of the breach of contract by the defendant, and asserted a right to hold the plaintiff to a contract to sell them to it at $1.25 per pair.   That company told the plaintiff that the entire lot had been sold and a substantial part had been delivered.   It was a fair inference that the Penn Shoe Company would not have paid a reasonable price for the shoes without litigation.   Nothing the plaintiff could have done to enforce his rights at law against the Penn Shoe Company in a distant State could have prevented a substantial loss to him.   A law suit would have been expensive and even if successful might have left the plaintiff with a net loss.   These inferences might have been drawn from the evidence.   While the acceptance by the plaintiff from the Penn Shoe Company of $1.25 per pair was a voluntary settlement on his part, where he was not standing on his strict legal rights, it might have been inferred that this was good judgment.   There is nothing in the record which requires the conclusion that this harmed the defendant or estopped the plaintiff from enforcing his rights against the defendant.   The instant case is distinguishable in its facts from cases like *Western Union Telegraph Co.*

v. *Cowin & Co.* 20 Fed. (2d) 103, where the breach of
contract by the telegraph company was discovered by
the sender of the message before it had suffered loss and
where a compromise price was agreed upon by the parties.
The jury, upon the facts and circumstances disclosed,
were not precluded from using their own knowledge of
practical affairs and finding that substantial loss beyond
mere nominal damages had been caused the plaintiff by
the breach of contract. by the defendant. This conclusion
might have been drawn even though the plaintiff had exer-
cised the utmost diligence to protect himself by attempt-
ing to recover from the Penn Shoe Company. *Lowrie* v.
*Castle*, 225 Mass. 37, 47–48. That was his duty. But
nevertheless he might have suffered actual loss. There is
authority to the effect that the plaintiff might have re-
covered the full value of the shoes from the Penn Shoe
Company in the circumstances disclosed as to the knowl-
edge of the latter. *Germain Fruit Co.* v. *Western Union
Telegraph Co.* 137 Cal. 598. 1 Williston on Contracts, Rev.
Ed. § 94. But it could not rightly have been ruled that the
plaintiff's loss was due to failure on his part to make a
genuine attempt to redress the wrong done him by the
Penn Shoe Company.

That damages to the plaintiff might have been inferred
falls within the principle illustrated by *Maynard* v. *Royal
Worcester Corset Co.* 200 Mass. 1, 8; *Cross* v. *Sharaffa*, 281
Mass. 329, 331; *Wheelock* v. *Postal Telegraph Cable Co.
of Massachusetts*, 197 Mass. 119, 126; *Potier* v. *A. W. Perry,
Inc.* 286 Mass. 602, 606–607; *Wrobel* v. *General Accident
Fire & Life Assurance Corp. Ltd.* 288 Mass. 206, 211. No
question arises as to the amount of damages because a
stipulation of parties covered that point if there was any
evidence which would justify a finding for the plaintiff.

The result is that a verdict was erroneously directed for
the defendant. The exceptions are sustained and, in accord-
ance with the stipulation, judgment is to be entered for the
plaintiff in the sum of $500,

*So ordered,*