110  907
d119 887
119  888

110  907
e121 326

110  907
f133 773

CASE 107—ACTION TO RECOVER DAMAGES FOR FAILURE TO CORRECTLY
TRANSMIT AND DELIVER A MESSAGE—MAY 17.

# Postal Tel. Cable Co. v. Schaefer, &c.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

JUDGMENT FOR PLAINTIFFS AND DEFENDANT APPEALS.   REVERSED.

TELEGRAPHS—MISTAKE IN TRANSMISSION OF MESSAGE—CONTRACT—
MEASURE OF DAMAGES—LIMITATION OF LIABILITY.

Held:   1. Where a telegraph company negligently delivered a differ-
ent message from that it was authorized to deliver, so that the
sender was represented as offering goods at a lower price than
that at which he had in fact offered them, and the supposed
offer was accepted in ignorance of the mistake, there was no
contract, and the sender was not bound to deliver the goods at
the lower price.

2. The sender of the message, upon discovering the mistake after the
goods were shipped, having refused to correct draft for price,
which was attached to bill of lading, and the supposed buyer
having, by an erroneous judgment, recovered damages against
him for his refusal to deliver the goods at the lower price, he
is not entitled to recover of the telegraph company the damages
thus recovered against him, or the costs of the litigation, but
only the difference between the price for which he offered to
sell the goods and the price for which they could, by the exer-
cise of ordinary care, have been sold in the market where they
were after the mistake was discovered—not to exceed, however,
the difference between the price at which he offered the goods
and the price offered for them.

3. The goods, which were perishable, having been attached by the
supposed buyer, and allowed to depreciate in value by reason
of decay and of a falling market, plaintiff can not recover any-
thing on that account, to the extent that he might have pre-
vented such loss by replevying the goods and selling them
promptly, or by procuring an order from the court for their
immediate sale.

4. A telegraph company, being a common carrier, can not, under
Constitution, section 196, limit its common-law liability by stipu-
lating that, if the message is not repeated, it shall not be liable,
beyond the cost of the message, for any mistake in trans-
mission.

J. R. McINTOSH and LEOPOLD & PENNEBAKER, ATTORNEYS FOR APPELLANT.

H. L. STONE of counsel.

## PROPOSITIONS OF LAW AND AUTHORITIES.

1. The measure of damages, where a mistake is made in a telegram, by substitution of one figure for another, is the difference between the price offered by the error of the telegram, and the market value at the point to which shipped; that is, what the seller could have gotten there. Western Union Tel. Co. v. Shotter, 71 Ga., 760; Watts v. Nevada Central Ry. Co., 62 Am. Stat. Rep., 781; Kinnaird v. Dudderar Bros., 21 Ky. Law Rep., 1251.

2. Where a party has been damaged, but through his own negligence and mistakes increases the damage, he can not recover the excess which was caused through his own mistake or negligence. Pepper v. W. U. Tel. Co., 4 L. R. A., 660; Hadley v. Baxendale, 9 Exch., 341.

3. Damages which arise remotely out of a cause of action, or are to some extent connected with it, if they do not flow naturally from it or could not in the ordinary course of events have been expected to arise from it, are not, in a legal sense, sufficiently proximate to authorize a recovery. Hadley v. Baxendale, 9 Exch., 341; Smith v. Western Union Tel. Co., 83 Ky., 104.

4. The telegraph company is not the agent of either party to a message, and if there is a mistake made in the transmission of the message, whereby one accepts a proposition which has been changed by mistake of the telegraph company, the minds of the parties have never met, and there is no contract. Pepper v. W. U. Tel. Co., 4 L. R. A., 660; Bigham v. Madison, 52 S. W. Rep., 1074; Bishop on Contracts, sec. 710.

5. Telegraph companies are not common carriers, and therefore section 196 of the Kentucky Constitution, which forbids common carriers from limiting their common law liability by contract, has no application. Primrose v. W. U. Tel. Co., 154 U. S., 1; Smith v. W. U. Tel. Co., 83 Ky., 104 (to the effect that telegraph companies are not common carriers).

6. The clause in the contract printed on the telegraph blank, to the effect that to insure accuracy messages must be repeated, is valid, and not against public policy. Primrose v. W. U. Tel. Co., 154 U. S., 1; W. U. Tel. Co. v. Carew, 15 Mich., 535-536; Camp v. W. U. Tel. Co., 1 Met., 168; U. S. Tel. Co. v. Gildersleeve, 29 Md., 232, 246-8; Passmore v. W. U. Tel. Co., 78 Pa. St., 238; Kiley v. W. U. Tel. Co., 109 N. Y., 231-5; Clement v. W. U. Tel. Co., 137 Mass., 463.

Postal Tel. Cable Co. v. Schaefer, &c.

ZACK PHELPS, ATTORNEY FOR APPELLEES. '

This case was tried before His Honor, Judge Field, and a jury. A verdict was rendered which did not cover the amount of damages really suffered by Schaefer & Sons because the court upon the preliminary motions to strike and the demurrers filed to the petition, cut down and limited the recovery so that the actual damage could not be recovered.

John Schaefer & Sons are commission merchants in the city of Louisville. On August 23, 1897, they sent to N. Bernstein & Co., of Cleveland, Ohio, a telegram reading as follows:

AUGUST 23, 1897.

N. *Bernstein & Co., Cleveland, Ohio*:

Bulk potatoes one seventy barrel; can ship two cars, nice stock, to-day; wire quick.

JOHN SCHAEFER & SONS.

This was received immediately by N. Bernstein at Cleveland, who replied at once by telegram through the Western Union Telegraph Company at follows:

CLEVELAND, O., August 23, 1897.

*John Schaefer & Sons, Louisville, Ky.*:

Telegram received; ship two cars your price.

N. BERNSTEIN.

Schaefer & Sons at once shipped the two cars upon this contract. Some time after, it was discovered that the Postal Telegraph Company, in transmitting the original message, had made a mistake and had sent the message as follows: "Bulk potatoes *one seven* barrel; can ship two cars, nice stock, to-day; wire quickly," the error being in sending the word "seven" instead of the word "seventy."

After discovering the mistake it took some days to make the investigation by telegrams and correspondence, and the plaintiff endeavored to recover the goods, but Bernstein & Co. had attached them at Cleveland, and a suit resulted, our clients being unable to get them released from the attachment, and by reason of the erroneous message, our clients lost the suit, and they are now claiming damages in the sum of $899.51.

The amount given by the jury in their verdict is $656, which was intended to cover the value of the potatoes and interest thereon, but allows nothing for costs, trouble or expenses, and we think we are clearly entitled to the sum allowed.

### AUTHORITIES CITED.

Reid v. Western Union Tel. Co., 34 Ky. Law Rep., 492; Ayer v. Western Union, 79 Me., 498; Saveland v. Green, 40 Wis., 431;

Western Union v. Shotter, 71 Ga., 768; Levy v. Western Union, 35 Mo., 177; Western Union Tel. Co. v. Abraham Hart, &c., 62 Ill. App., 120; Same v. Richmond, 16 Am. & Eng. Corp. Case, 263; Same v. Harris, 17 Ill. App., 347; Postal Tel. Co. v. Lathrop, 131 Ill., 575; U. S. Tel. Co. v. Wenger, 55 Pa. St., 262; Western Union Tel. Co. v. Eubank, 18 Ky. Law Rep., 995.

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING.

This suit was instituted by the appellees, who were plaintiffs in the court below, against appellants, who own and operate a telegraph line, to recover damages for their failure to correctly transmit and deliver a certain telegram to N. Bernstein & Co., of Cleveland, Ohio. The facts necessary to a correct understanding of the case are as follows: On the 23d day of August, 1897, John Schaefer & Sons, wholesale produce and fruit merchants at Louisville, Ky., delivered to the defendant, for transmission to N. Bernstein & Co., produce brokers in Cleveland, Ohio, this telegram: "Bulk potatoes one seventy barrel. Can ship two cars nice stock to-day. Wire quick." The message was written out upon one of defendant's printed blanks. On the same day they received from Bernstein & Co., over the Western Union Telegraph line, the following response to their message: "Telegram received. Ship two cars, your price." And in response to this telegram appellees shipped two cars of bulk potatoes, amounting to 340 barrels, at the same time advising Bernstein & Co. of the shipment by a telegram which reads as follows: "Ship cars L. & N., 15,231 and 15,483 potatoes via Big 4." And on the same day they mailed invoice with bill of lading attached to a draft for $589, or the price of 340 barrels of potatoes at $1.70 per barrel. On the 25th day of August, appellees received from Bernstein & Co., a telegram which reads, viz.: "Bill received 2 cars potatoes one

seventy bbl. Price named in message one seven bbl. Please explain." In response to this, appellant answered: "Our copy of telegram reads one seventy. Have notified telegraph company." And on the next day appellee received from the Ohio people the following message: "Your telegram delivered to us says one seven bbl. We shall insist upon the two cars at that price. Instruct bank correct draft at rate of one seven bbl. Will give you until 3 o'clock. You will have to look to telegraph company, not to us." To which appellees replied on the same day: "We do not comply to your declaration of draft. See telegraph company if error." All these messages passed between the parties before the arrival of the potatoes at Cleveland, which was on the 27th, when Bernstein instituted a suit for damages against appellee for the difference between the contract price claimed by him and the value of the potatoes, and attached the potatoes in the hands of the railroad company. In a day or two thereafter, appellees notified appellant of the exact situation, and asked them whether they should accept $1.07 per barrel for the potatoes from Bernstein & Co. Appellant declined to advise them as to what course to pursue. They thereupon employed an attorney to defend the suit instituted against them by Bernstein & Co., and this litigation was prolonged for some time. The potatoes in the meantime were left in the cars on the track of the railroad company for several weeks, when they were sold for $250 to pay the freight; the overplus being held to await the result of the suit of Bernstein & Co. At the conclusion of the litigation with Bernstein & Co., the appellees, Schaefer & Sons, instituted this suit, in which they allege that they had not only lost all of their potatoes, which were worth $570, but in addition

thereto, had been compelled to pay out $321.51 in defending the suit instituted against them by Bernstein & Co., making the aggregate of $898.51, which was, however, to be credited with $114.10, the proceeds of the sale, less freight, leaving a balance of $785.41, which they alleged was directly attributable to the negligence and carelessness of the defendant in improperly transmitting their message. They also made a claim for damages arising from the loss of Bernstein's custom. The circuit judge sustained a general demurrer to all that part of the petition which sought to recover for attorney's fees, cost of the attachment suit, or any of the items except what he regarded as the direct loss on the potatoes. The defendant, in its answer, says that it is not liable to the plaintiff for the amount sued for, or for any amount: First. Because plaintiffs were under no legal obligations to deliver the potatoes sued for to Bernstein & Co., at the price of $1.07 per barrel, as the message of plaintiff and the response of Bernstein & Co., did not constitute a binding and legal contract between them, whereby plaintiffs were bound to ship the potatoes at the price named in the telegram. Second. Because the damages sued for are not the natural and proximate consequences of the mistake complained of in the transmission of plaintiffs' messaage to Bernstein & Co., and were not within the contemplation of the parties to the contract for the transmission of the telegram at the time it was sent. Third. That as the dispatch was not repeated, their liability was, by the terms of the printed blank upon which it was written, limited to 40 cents,—the cost of the telegram. Fourth. It is insisted that in no event can they be liable for any greater sum than the difference in the price named in the telegram as received by it; and the fair market val-

ue of the potatoes on the Cleveland market when they arrived.    Fifth. It is insisted that plaintiffs made no reasonable efforts to render their injury as small as possible, but negligently permitted the potatoes to remain in the cars until many of them were spoiled and destroyed.    So much of the answer as pleaded that plaintiffs were under no legal obligation to deliver the potatoes sued for at the price of the delivered message, and also that part of the answer which denied liability because the dispatch was not repeated, was stricken out.    A trial before a jury resulted in a verdict for $656, the value of 340 barrels of potatoes at $1.70, with 6 per cent. interest thereon from the 31st day of August, 1896; and, a motion for a new trial having been overruled, defendants prosecute this appeal.

It is complained that the court erred in its instruction as to the measure of damage, and also that the verdict is flagrantly against the weight of evidence.    The instruction complained of is as follows, viz.:    "The court instructs the jury that if they shall believe from the evidence that, by the negligence of the defendant    or    its agent, the telegram mentioned in the petition, sent by the plaintiffs to N. Bernstein, was    changed    so as to read $1.07,    instead    of    $1.70,    per    barrel    for    the    potatoes    in    controversy,    when    the    said    telegram was    received    by    the    said    Bernstein    &    Co.,    and that plaintiffs were thereby damaged, then they should find for the plaintiffs in such a sum as they believe, from the evidence, represented the difference between potatoes at $1.70 per barrel and the sum for which the plaintiffs could have sold them at Cleveland, Ohio, after definitely learning of the mistake in the telegram by the exercise of ordinary care and diligence, if there was such mistake. If they find for the plaintiffs, they may, in their discretion,

allow interest from the 23d day of August, 1897." The deposition of Nathan Bernstein was taken and read as evidence by the plaintiffs. He testified that he recovered a judgment against appellees for $187, and his costs by way of damages against appellee for failure to deliver 340 barrels of potatoes to him at $1.07 per barrel; that these potatoes were worth in Cleveland on the day on which they arrived in that city, from $1.65 to $1.80 per barrel, with freight charges, which were about 28 cents a barrel added; that within a few days the price of potatoes began to decline in Cleveland, because of the delivery of home-grown potatoes; and that, at the time the potatoes in contest were sold, they had remained locked up in the cars for several weeks, and that many of them had rotted; and that they only brought $250 for the whole lot.

It is the contention of appellees that appellant was their agent in sending the telegram to Bernstein & Co., and that the delivery of the erroneous message created and gave rise to a valid and enforceable contract on their part to deliver the potatoes to the sendee at the price named, and this view seems to have been taken by the Ohio magistrate, who presided in the trial of the suit instituted by Bernstein & Co. against plaintiff; but, in our opinion, this view of the law is an erroneous one, and is in conflict with the great weight of authority both in England and in this country. Gray, in his treatise on Communications by Telegram (page 189), says: "A telegraph company may perhaps be called a 'special agent,' since it is employed to do a particular act, namely, to communicate a certain message. If so, the employer is responsible on the message as delivered only where that message is the one which he authorized the company to communicate, as distinguished from a certain message."

And he refers to Story, Ag. (8th Ed.), sections 126-133. The same author also says:    "A person who employs a telegraph company authorizes it and holds it out as authorized, only to communicate a certain message; and, while he is responsible upon the message if the company duly delivers it, he is not responsible upon any other message which the company may deliver in its stead."    This exact question was fully considered in the case of Pepper v. Telegraph Co., decided by the supreme court of Tennessee, and reported in 11 S. W., 783 (4 L. R. A., 661).    In that case the court said, viz.:    "The minds of the party who sends a message in certain words, and the party who receives the message in entirely different words, have never met.    Neither can, therefore, be bound the one to the other."    In our opinion, there was no binding or legal obligation resting upon Schaefer & Sons to have delivered the potatoes to Bernstein & Co. at the price erroneously communicated by the message which was delivered to them by the appellant company; and they were entitled to recover from appellants any damages   which they sustained which arose naturally (according to the usual course of things) from such negligence; or, as the rule is very pertinently expressed in Hadley v. Baxendale, 9 Exch. 341 (the leading English case upon this question, and one which has been almost universally followed in this country), viz.:    "Where two parties have made a contract, which one of them has broken, the damage which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either as arising naturally (according to the usual course of things) from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the

time they made the contract, as the probable result of a breach of it." But the law imposes upon appellees the corresponding duty to make all reasonable efforts to render that injury as small as possible, and does not permit them to recover damages for any increase of loss consequent upon the failure to perform that duty; or, as Mr. Gray expresses it in his work on Communications by Telegram (page 178): "The measure of damages for that negligence, where the message related to marketable matter, is indemnification for the loss that plaintiff sustained, or would have sustained, in placing himself, in a reasonable manner, and within a reasonable time after notification of the negligence, in the position which he might reasonably have been expected to occupy if the message had been duly and correctly communicated; and a failure to do so, does not entitle the person injured by the negligence of the telegraph company to recover damages for any increase of loss attributable to that failure." Appellees knew that potatoes were, from their nature, perishable, and liable to rapidly deteriorate in value when left in bulk in the cars on which they were shipped, standing on the railroad switch, and it is equally certain that they knew that the tendency of the market for new potatoes at that season of the year was necessarily downward; and ordinary prudence required that they should have taken prompt steps to have had them disposed of to the best advantage. The uncontradicted testimony of Bernstein is to the effect that these potatoes, when they arrived in Cleveland, were worth all that appellee had offered to sell them for; and it is apparent that, if they had acted with ordinary promptness and judgment, the necessary loss on them from appellant's negligence could not, under any circumstances, have exceeded the difference between what

they asked for the potatoes and what Bernstein & Co. were willing to give for them.    Appellees could not abandon their potatoes, and leave them to rot and decay upon the railroad track for weeks, and be sold for freight charges, and then recover from appellant damages which were the result of their own negligence.    Ordinary prudence would have suggested that they replevy them and sell them to the best advantage, or at least to have applied to the Ohio court for an order for their immediate sale, and ask that the proceeds be held to await the final determination of the litigation with Bernstein & Co.

There is no dispute as to the facts in the matter.    The real question to be settled is the measure of damages in the case.    Under the facts of this case, the court should have instructed the jury that, if they believed from the evidence that the defendant or its agent had negligently committed an error in transmitting the message from Schaefer & Sons to Bernstein & Co., they should find for plaintiff the actual damage to plaintiffs directly attributable to such error, and that the criterion for determining the amount of such damage was the difference between potatoes at $1.70 per barrel and the sum for which they could have been sold in Cleveland, Ohio, by the plaintiffs after definitely learning of the mistake in the telegram by the exercise of ordinary care and diligence,—not exceeding, however, 63 cents on the barrel.

The defense relied on in the answer which is predicated upon the terms of the special contract contained in the printed blanks of the company was fully considered and decided in the case of Telegraph Co. v. Eubanks, 100 Ky., 591 (18 R., 995) (38 S. W., 1068) (36 L. R. A., 711).    It was there held that, under the provisions of section 199 of the Kentucky Constitution, telegraph companies were to be treated as

common carriers, and were therefore not permitted, under the provisions of section 196, to contract for relief from their common-law liability for negligence.    The court is not disposed to recede from the position taken in that case, and it is therefore unnecessary for us to review that question.    For the reasons indicated, the judgment is reversed, and the cause remanded for proceedings consistent with this opinion.

Judge Hobson's dissenting opinion:

It seems to me that the court in this case loses sight entirely of substantial justice, and that a simple illustration will show this:    Jones is a common carrier in the city of Louisville, whose business is to deliver parcels for compensation.    Smith has a bar of gold, of value in the market of $500.    He delivers his bar of gold to Jones, to carry it to a jeweler, with a written offer to sell it to the jeweler for $500.    Jones loses the writing stipulating the price, and thereupon gets up another, offering to sell the bar of gold for $300, and delivers the bar with this writing to the jeweler, who immediately accepts the proposition, and notifies Smith of his acceptance.    Smith at once informs him that there is a mistake, and that the price is $500.    The jeweler insists on his bargain, and plain Mr. Smith, being ignorant of the intricacies of the law, is in great trouble.    So he goes to see Jones, and tells him the situation.    He asks Jones what he must do, and wants to know if Jones will pay the $200 if he lets the jeweler keep the bar of gold at $300.    But Jones knows something of the uncertainty of the law, and says to Smith:    "It is true, I have been negligent and I have gotten you into trouble, but you must get out the best way you can.    I can not tell you what to do.    My busi-

ness is to carry for people, not to help my customers out
of trouble when I get them into it." Smith then reasons
thus with himself: "If I let the jeweler have my bar of
gold for $300, Jones will say I ought to have taken legal
counsel." So he goes to a lawyer. The lawyer tells him
that the jeweler got no title to the bar of gold by reason
of the false offer delivered by Jones, and that he must
take the matter to the courts. Smith realizes that if he
takes legal counsel, and then does not follow his lawyer's
advice, Jones may have better reasons for escaping lia-
bility than if he had not consulted the lawyer at all. So
he talks to his counsel, and finds that the weight of au-
thority supports the advice given him. He concludes
then to litigate the matter with the jeweler, but the court
to whom the case is submitted takes a different view of
the matter from his lawyer, and, following the minority
of the authorities, decides against Smith and in favor of
the jeweler. The result of the litigation is that Smith
loses his bar of gold, and is out $320 in costs besides. He
then sues Jones for damages. Jones says: "You paid
me forty cents to carry that package to the jeweler, and
that is the limit of my liability; or, at the most, I am only
liable for $200, which would have been the loss if you had
accepted the jeweler's proposition to pay you the $300."
But says Smith: "I asked you to agree to that before I
went to law with the jeweler, and you refused to do so,
and prepared yourself to escape liability altogether if I
accepted the jeweler's offer; for, if I had done that, you
would have said that the jeweler knew a $500 bar of gold
could not be bought for $300 and that the inadequacy of
the price was sufficient to put him on notice that there
was a mistake. And you would have also said that I had
joined hands with the jeweler to rob you. Now, I did

not know what to do, but to get a lawyer and make the best fight I could, and this I have done. My property is lost. Your negligence is the cause of it, and you should bear the loss." This is substantially the case that we have. The circuit court instructed the jury that they should find for appellees the market value of the property they had lost by reason of appellant's neglect, less so much of the loss as appellees might have prevented by the exercise of such care and diligence as might reasonably be expected of an ordinarily prudent person under the circumstances. This was more favorable to appellant than the law warranted, for it took away from the jury all power to compensate appellees for the expenses they incurred in the litigation which appellant forced them to undertake. The fundamental principle of damages is compensation for the injury sustained, as the direct result of the negligence complained of. It is a well settled rule in this State that, where there is any evidence, the question is for the jury; and I am at a loss to understand the principle of law upon which appellees' recovery is limited to the amount which they would have lost if they had submitted without resistance to the unconscionable demand of Bernstein. For potatoes are a staple. They were selling in the market for $1.75, and Bernstein as a dealer, could not but know that the telegram offering to sell them for $1.07 was a mistake.

Whether appellees used ordinary care in not executing a bond in the Ohio court, and thus regaining possession of the potatoes, or in failing to have the property sold at once, or in any other step taken or omitted in that action, was a question for the jury. This was all clearly submitted to the jury by the court below, and they found against appellant on the issue. In determining what was

ordinary care on the part of appellees we should bear in
mind that the litigation was not in Kentucky, but in a
distant city, and that appellees had, of necessity, to rely
to a great extent on the legal advice they there received.
What the liability would be upon a bond, the difficulty of
executing it, the necessity of its execution, the probable
delay of the action if the bond was not given, the security
appellees had for a wrongful attachment under the Ohio
laws, and whether or not it was best, in view of all the
circumstances, to trust to this, or to take other steps,
were questions that the men on the ground, of necessity,
had to decide.    It has been well said that when the neg-
ligence of the defendant is admitted, and it is also admit-
ted that this negligence had placed the complainant in a
position where loss may ensue, the court will not be as-
tute to hunt for errors in his conduct, in endeavoring to
relieve himself of the disastrous consequences of the de-
fendant's negligence.    The appellees here were interest-
ed in getting out of the dilemma in Cleveland at as little
loss as possible; for it was certain that they had to pay
the piper; and trust to the uncertainties of the future to
get their money back.    They exercised the same care for
the protection of appellant that they exercised for them-
selves, and that other persons in similar controversies in
the courts daily exercise.    The steps they took were such
as are taken in the majority of cases.    Appellant had no
right to demand of them extraordinary diligence, or the
assumpton of extraordinary risks.    Appellant knew the
situation, and could have taken steps for its protection,
if it deemed extraordinary steps necessary.    I am there-
fore of opinion that the question of care was properly
submitted to the jury, and that the verdict of the jury is
right.    But if you charge appellees with the entire loss.

by reason of the deterioration in the potatoes or the delay in selling them, and subtract this from their total loss, it would still leave them out of pocket an amount practically as large as found by the jury. It seems to me that this is going as far as the ends of justice permit, even on the basis assumed by the court. The cost of the litigation as to the claim of Bernstein ensued naturally from the defendant's negligence, and was the proximate result of it. Such cost is as legitimate an element of damage as the cost in defending a title conveyed with warranty, or in attempting to save a cargo from a wrecked vessel. Appellees could not give up their property to Bernstein without contesting his right and look to appellant at all. The cost of this contest which they were forced to make,  as their property was seized, is as necessary a part of their legitimate loss as the value of the property itself. No more forceful illustration than the result of this controversy can be given of the illusiveness of legal remedies. But for the illusion of an adequate remedy against the telegraph company, appellees might have charged off to the loss account the $283 claimed by Bernstein, and sustain no further loss. In their effort to save themselves, they wound up with practically a loss of $900. This they might have charged to their loss account, and been no worse off. But when they have finished with this case on the basis of recovery laid down by the court, and have paid all expenses, they will be still sadder and wiser men. When such a result is worked out as the end of the law, small wonder is it that so many people prefer to trust verdicts of juries for substantial justice. I therefore dissent from the opinion of the court.

Petition for rehearing overruled.