# WESTERN UNION TELEGRAPH COMPANY

*vs.*

# VICTOR G. BLOEDE COMPANY.

*Telegraph Companies*: *mistakes in transmission of messages;
liability; damages—loss of profits on goods sold. Plead-
ing*: *variance; appeals; exceptions. Evidence*:
*weight; province of jury.*

Before the passage of Chapter 110 of the Acts of 1914, not-
withstanding the provisions of the Code, section 9 of Article 5,
relating to the necessity for the raising below of questions as to
prayers before the matter can be passed on by the Court of Ap-
peals, yet if prayers referred to the pleadings, the Court was
called upon to examine them, and if there was any variance
between the pleadings and the proof, such reference in the pray-
ers was deemed sufficient to permit the variance to be availed of
on appeal.                                        p. 352

Under the Act of 1914, such a variance can not be taken
advantage of by a mere reference in the prayers to the plead-
ings; but in order to take advantage of such defect, the prayers
should set out the point as to which it is claimed a variance
exists by referring to that portion of the declaration which it is
claimed is at variance with the evidence.          pp. 352-353

Where a manufacturer, without any fault of his own, but by
the error of the Telegraph Company through which he transmits
his message, is made to make an offer to furnish goods at a figure

lower than he intended, and the offer is accepted, and the manufacture of the goods is begun before the mistake is discovered, then if the manufacture of the goods is such that it must be a "continuous process," to stop the manufacture of which before the completion of the order, would cause a loss greater than would have been occasioned by a sale at the mistaken price quoted, the mere knowledge of the manufacturer, of the existence of the mistake, before the delivery of the goods, will not limit his right of recovery, against the Telegraph Company, to the mere cost of transmitting the message.                    p. 354

The weight and correctness of evidence is for the jury, and not for the court.                              p. 354

In general, where an offer for the sale of goods at a certain price is made by telegraph, and, by the mistake of the Telegraph Company in transmitting the message, a lower price is quoted than was intended, the measure of damages, if the goods, at such a lower price, were accepted by the vendee, and obliged to be delivered by the vendor, is the difference between the price named in the telegram, as delivered for transmission, and the price which the seller by the exercise of reasonable prudence and diligence could have obtained for the goods, and not the difference between the price as it was quoted to the Telegraph Company for transmission and the price as actually conveyed to the addressee through the Telegraph Company's mistake.

p. 357

The difference between the prices named by the vendor, as he sent it for transmission, and the lower price telegraphed through error by the Telegraph Company, may be accepted as *evidence* of the damages actually sustained, in case the goods were delivered to the addressee before the sender discovers the mistake, if the sender could not reduce his loss by disposing of the goods in any other manner.                    p. 357

*Decided January 14th, 1916.*

Appeal from the Court of Common Pleas of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, O. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*W. Irvine Cross* and *Francis R. Cross* (with whom was *Albert T. Benedict* and *Francis R. Stark* on the brief), for the appellant.

*W. W. Parker* and *John R. M. Staum,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The Victor G. Bloede Company had an inquiry from the American Paper Goods Company for a price on a carload of envelope gum, similar to what it had previously furnished that company. After some correspondence in which the Paper Company informed the Bloede Company that the price named was too high and asked if a better price could be given, the Bloede Company on March 24, 1914, gave to the Western Union Telegraph Company in Baltimore the following telegram to be sent to the Paper Company: "Offer car delivered four dollars and ninety cents, sixty days net, five per cent. discount for cash. Wire acceptance." That was explained to mean an offer for sale by the Bloede Company to the Paper Company of one car, consisting of 175 bags or 44,250 pounds of envelope gum at $4.90 per hundred pounds delivered. The message delivered by the Telegraph Company read "four dollars and fifty cents," instead of "four dollars and ninety cents," being in other respects correct. The Paper Company replied the same day by telegram as follows: "We accept your telegraph quotations just received. Order by tonight's mail," and the same day sent the following letter:

"We are in receipt of your telegram this A. M. reading as follows: 'Offer car delivered 450—60 days net, five per cent. discount, for cash. Wire acceptance.' We are pleased to note you have revised your quotation on this car of gum, which enables us to give you the order and keep our gum uniform. In reply to the

above message we wired you as per enclosed confirmation that we accept telegraphic quotation and would forward order by tonight's mail. We accordingly enclose herewith Order No. 5424, and must impress upon you the fact that the car must be here as early as April 20th."

The order enclosed in that letter was as follows:

"S. T. G. 1.—100 bags light shade envelope gum. S. T. G. 2.—75 bags dark shade envelope gum, at 4.50 per hundred f. o. b. Berlin, Conn., 60 days net, 5 per cent. cash 10 days. This confirms telegraph order of today. Gum must be of same quality as you have furnished us in the past and car is to be delivered here not later than April 20th."

On March 24th, Mr. Victor G. Bloede, President, wrote to the Paper Company, acknowledging receipt of their letter of 23rd inst. (which we understand was the one asking for quotations), and stating amongst other things that:

"In accordance with your suggestion, we wired you on receipt of your letter giving you a revised quotation of 4.90 (our previous figure), 60 days net, five per cent. discount for cash, which reduces the net figure at which we are to deliver the carload to you to 4.65½ per 100 pounds, and we are much pleased to receive your acceptance by wire and have entered your order and will make the shipment within the time specified on your original inquiry. We are very much obliged to you for favoring us in this matter, which we believe you will find to your interest. The price named is practically cost of the goods to us at the present cost of crude material, and we will greatly appreciate it if you will consider the transaction as strictly confidential."

On March 25th the Bloede Company wrote to the Paper Company as follows:

"Your favor of the 24th instant covering order and copy of your telegram came duly to hand this morning

and developed the fact that there has been a blunder somewhere in the forwarding of the quotation, as our offer was simply an offer of five per cent. discount for cash on price ($4.90) previously given you, and not $4.50 per hundred, as your confirmation states. We were very careful to avoid, as far as we knew how, the possibility of a blunder in sending the wire quotation; and hence immediately called up the manager of the Western Union, who informed us that the price of $4.90 was correct and had been so forwarded by the Baltimore office to their New Britain office. We then requested them to immediately communicate with the New Britain office and advise us if an error had occurred there, and we are just in receipt of their reply, reading as follows: 'Message was delivered at New Britain $4.50,' which puts the mistake right up to the Western Union Company. It would be entirely impossible for us to confirm the price of $4.50, for as we wrote you yesterday, the price we quoted was practically cost, and the price as revised by the Western Union would mean an absolute loss to us, and we cannot hold ourselves responsible for the execution of the order at this figure. We are taking up the matter with the Western Union Company, and will advise you further as soon as we ascertain what their position will be in making good the loss to us, should we book the order."

The Paper Company replied on April 3rd as follows:

"Referring to your favor of the 25th ultimo, as we understand the situation, you are making up the car of gum called for on our order No. 5424, and will invoice it to us at $4.50 per 100, f. o. b. Berlin, Conn., less 5 per cent. cash 10 days, and that you will collect the difference between that price and the price given to the Western Union Telegraph Company of your city on March 24th. If our understanding of this matter is not correct, kindly write us on receipt of this letter that we may have time to purchase this gum elsewhere before our present supply is exhausted."

Again on April 8th that company wrote to the Bloede Company:

"We have had no reply to our letter of the 3rd as to whether you were making up our carload of gum or not, and accordingly wired you today, as per enclosed confirmation, and hope to receive some information from you in regard to the situation today."

On April 8th the Bloede Company wrote as follows:

"In reply to your esteemed favor of April 3rd it is our understanding that we quoted you a car of gum on the basis of $4.90 less 5 per cent., and that your acceptance covers this. It appears, however, that the Telegraph Company made an error in the message as delivered to you, and hence, if you have placed an order with us at a higher price than you could otherwise purchase the same quality, you have been injured to the extent of the difference between our price and that at which you might have purchased. Your claim for the loss, properly supported by the necessary papers, will enable us to present the matter to the Telegraph Company, and feel assured there will be no difficulty in obtaining an equitable adjustment. In the meantime, we have made up the goods, and will forward this week, as we feel sure that all you want is a fair and just settlement of the matter."

On April 9th the Bloede Company also wrote to the Paper Company:

"In answer to your telegram, we wrote you fully under date of the 8th. The car is being loaded now, and expect to forward promptly. Trusting same will reach you promptly, we are," etc.

The gum was shipped and billed on April 11th, and was unloaded on April 20th. The bills arrived before the 15th, and on that date the Paper Company returned the invoice as it was billed at $4.90, instead of $4.50. On April 23rd the

Paper Company sent a check on the basis of $4.50, and on April 27th the Bloede Company returned it, saying:

> "We regret that we are compelled to return your check of April 3rd, $1,800.98, but we can not accept same, as to do so in this form would prevent either of us securing any relief from the Western Union Telegraph Company for their error. In the first place, the price $4.50 which you tender is much below our actual cost of production, and would mean a serious loss to us. Again, the amount of damage that you have suffered can not exceed the difference between our quotation of $4.90 delivered, less 5 per cent. for cash, and the lowest bid that you received from other parties on the same grade. This is all that we can compel or expect the Telegraph Co. to pay, and they are willing to settle only on this basis—relying on previous judicial decisions for their stand."

After some further correspondence, the Bloede Company accepted the check and filed a claim with the Telegraph Company. This suit was brought to recover the difference between the price named, $4.90, and that received by the Paper Company, $4.50, and having obtained a verdict for that amount, this appeal was taken from the judgment rendered thereon. The only exception in the record is to granting the plaintiff's *second* prayer and its *first* prayer, as amended by the Court, and to rejecting the defendant's *first* and *third* prayers. The plaintiff's first prayer, after submitting to the jury to find the sending of the message by the Bloede Company and the form in which it was delivered, continued: "and that by reason of the erroneous transmission and delivery of said message by the defendant, if the jury shall so find, the plaintiff was thereby caused the loss of the difference between the price quoted by the plaintiff, and the price as delivered by the defendant, that then the plaintiff is entitled to recover from the defendant such difference in price, *unless the jury shall further find that prior to undertaking in any way the*

*carrying out of the contract by it that the telegram of March
24, 1914, had been incorrectly sent."*

The part italicized shows the amendment of the Court.
Something is evidently omitted from that amendment—probably the words "it knew," or something to that effect, were
intended to be before the words "that the telegram of March
24, 1914, had been incorrectly sent." The defendant's first
prayer, which was rejected, was as follows: "The Court instructs the jury that by the undisputed evidence in the case
the plaintiff before the goods were delivered and before booking the order from the American Paper Goods Company
knew of the mistake in the transmission of the telegram, and
was, therefore, under no legal obligation to make the shipment, and can recover no damages beyond the amount paid
by it to the defendant Telegraph Company for the transmission of the telegram to the American Paper Goods Company,
on March 24th, 1914," and the third was, "The Court instructs the jury, that, by the undisputed evidence in this
case, the plaintiff company knew of the mistake in the delivery of the telegram of March 24, 1914, before it delivered
the carload of goods, to the American Paper Goods Company,
and under the pleadings in this case the damage must, therefore, be limited to the amount paid by it to the Telegraph
Company for the transmission of the telegram of March 24,
1914, to the American Paper Goods Company."

The one chiefly relied on by the appellant is the third, and
it contends that *under the pleadings* the plaintiff was not entitled to recover, because the *narr.* alleges that its offer "was
at once accepted by said American Paper Goods Company
without this plaintiff knowing of the error in said telegraphic
message, and said goods were delivered by this plaintiff to
the said American Paper Goods Company upon the terms
of the original and correct offer of this plaintiff, this plaintiff
believing when said goods were delivered by it to said American Paper Goods Company, that they were sold and delivered at the rate of four dollars and ninety cents per hundred
pounds, this plaintiff believing further that his original and

correct offer to sell said goods at the rate of four dollars and
ninety cents per hundred pounds had been accepted by said
American Paper Goods Company," while the evidence shows
that the plaintiff did know of the mistake in the telegram
before the goods were delivered.  The appellee contends that
even if the appellant be correct in his theory about the third
prayer that it can be of no avail in this Court by reason of
Chapter 110 of Acts of 1914, now section 9A of Article 5
(Vol. 3) of the Code, which is as follows:  "The fact that a
prayer or instruction which refers in general terms to the
pleadings was granted or refused by the Court below, shall
not be sufficient to show that the point or question of a vari-
ance between the pleadings and the evidence was tried and
decided in the Court below, as required by Section 9; and the
question of such variance shall not be considered as having
been raised by any prayer or instruction below, unless such
prayer or instruction shall state specifically the points where-
in it is claimed that such variance exists."

It had been decided in a number of cases that notwith-
standing the provisions of section 9 of Article 5, if a prayer
referred to the pleadings, the Court was called upon to ex-
amine them, and hence if there was a variance between the
pleadings and proof it could be thus taken advantage of.
The cases of *M. & M. T. Co.* v. *State, use Hazelton,* 108 Md.
564; *Ward* v. *Schlosser,* 111 Md. 534; *Smith Co.* v. *Smick,*
119 Md. 279, and *Baltimore* v. *Stalford,* 123 Md. 269, are
amongst the latest.  Inasmuch as the point was not always in
fact called to the attention of the Court, judgments were
sometimes reversed in this Court by reason of the variance
when the lower Court had not in reality passed on the ques-
tion.  Chapter 110 of the Acts of 1914 was therefore passed
to correct that, and it is an important statute which should be
construed liberally, so as to prevent the injustice which was
often done by referring in a prayer to the pleadings gener-
ally without calling the attention of the Court or the opposite
party to the particular defect complained of.  This is the
first case that has been before us concerning that Act, and

we think the prayer should have more specifically set out the points wherein it is claimed that such variance existed, by referring to the portion of the declaration which it is contended was at variance with the evidence. But in addition to that, we do not think the prayer states a correct legal proposition. The amount of recovery may depend upon something more than mere knowledge of the mistake before the delivery of the goods, for it might well be that the seller had good reason to believe that the purchaser would pay the price named in the message given to the Telegraph Company, or that it had, before it knew of the mistake, done something in the preparation of the articles sold which would cause a total or partial loss if not delivered, and hence it would be the seller's duty to do what it could to avoid unnecessary damages, as indeed the second prayer of the defendant in this case instructed the jury. There is testimony that before Mr. Thomas, the Vice-President and General Manager of the Bloede Company, knew of the error in the telegram, he had directed the work to be started. His evidence was in part as follows: "You discovered shortly after the order was accepted by the American Paper Goods Company, that there had been this error made, didn't you? A. When we received the formal printed form of order and discovered there was a discrepancy in the price between that which we had quoted and what they had repeated to us, which I at first thought might be a stenographer's error on account of another correction which had been made with pen in the order, we took the matter up with them at once. Q. And in the meantime did you stop the manufacture of this order? A. No, we didn't, because we couldn't stop the process well after it had begun, and the chemicals were added. It is necessary to make it a continuous process. * * * Q. Was it or not possible for you to have prevented this loss after you discovered the error? A. No, because envelope gum is a peculiar substance that is made up according to the requirements of each individual customer and according to their method of working it, and the class of paper and the different purposes for

which they use it, and the quality of gum that they use, and the American Paper Goods Company has a gum that is made for them exclusively, and which is not used to my knowledge by any other manufacturer, and we would have been compelled to finish the goods after started because if we did not, there would be the danger of spontaneous combustion and we would not have had any orders from that time until the present time for that same quality of gum from any other firm." The weight and correctness of his evidence were for the jury, and not for the Court and hence the Court could not say that if the plaintiff knew the mistake before it delivered the carload of goods it was limited in its recovery to the amount paid by it to the Telegraph Company for the transmission of the telegram.

The question whether one who makes an offer by telegram, which is altered in the course of transmission, and the altered telegram is received in good faith without knowledge of the alteration, is bound by the telegram as delivered has been differently decided. Some cases hold that he is, while others hold the contrary. In *Brantly on Contracts,* 81, that author takes the position that the seller is not so liable, because he never gave his assent to the telegram as delivered, and many cases are to the same effect. But we do not deem it necessary to now determine that question, as we think the documentary evidence sufficiently shows that the Paper Company did not propose to hold the Bloede Company responsible if it refused to deliver the goods at $4.50. It wrote on April 3rd, after stating their view of the situation, "If our understanding of the matter is not correct, kindly write us on receipt of this letter that we may have time to purchase the gum elsewhere before our present supply is exhausted," and in other letters indicated that it would not attempt to hold it at that price. If, however, the evidence of Mr. Thomas is correct, his company was in danger of sustaining loss by reason of the error in the telegram, regardless of whether it was bound to deliver the gum to the Paper Company, and, if so, it had the right to hold the Telegraph Company responsible for its loss, if any

was sustained. But the question still is whether it could legally recover the damages allowed by the lower Court. By the second prayer of the plaintiff the jury was instructed that if they found for the plaintiff "their verdict should be for the difference between the price quoted by the plaintiff in the message as delivered to the defendant, and the price quoted by the defendant in its message as delivered by it to the" Paper Company.

There is nothing in the record tending to show that the Paper Company would have accepted the offer, if the message had been correctly delivered to it. On the contrary, the letters from it offered in evidence by the Bloede Company are to the effect that it would not have accepted the offer. The one of April 15th, 1914, said: "We could not receive this material at the price you have invoiced it, as it would be much higher than our other quotations," and as we have seen, they returned the invoice at $4.90. Mr. Graham, the purchasing agent of the Paper Company, who was called by the plaintiff, in answer to a question on cross-examination as to what was the lowest bid he received besides that of the Bloede Company, replied, "That the other quotation was a verbal one made in the office; that he found no letter confirming it, but a pencil memorandum of such a quotation, of $4.70 per 100 pounds, less 3%. That less 3% means cash discount, if paid within 10 days of date of invoice."

But in addition to that we do not understand the measure of damages announced in that prayer to be the correct one. The appellee cites 37 *Cyc.* 1771, 1772, and on the first page it is said: "Where in a message quoting a price to plaintiff the price is changed to a larger amount, which is paid by plaintiff, it has been held that the measure of damages is the difference between the price as stated in the original message, and the higher price paid by plaintiff." But that was where the purchaser had paid more by reason of an error in the transmission of the telegram than he would have paid, and it was held that that was the correct measure of damages under those circumstances. What we have quoted above is

followed by this statement; "but on the contrary it has been held that while plaintiff cannot recover more than this difference, he is not necessarily entitled to recover this amount, his actual loss being the difference between the price paid and the market value of the property purchased. Plaintiff is also entitled to recover the loss actually sustained when by reason of an error in transmission he is caused to sell property for a price less than that offered or intended." In *Postal Tel. Co. v. Schaefer,* 110 Ky. 907, S. C. 62 S. W. 1119, cited in the note to *Cyc.,* where the selling offer was changed from $1.70 to $1.07 per barrel, and the goods were shipped and the mistake not discovered until the buyer refused to take them and pay the draft, it was held that the measure of damages was the difference between the sum based on $1.70 per barrel and the amount which plaintiff by ordinary care and diligence could have sold them for at the place to which they were shipped, not exceeding, however, 63 cents, the difference between the two prices named, on the barrel. In *Reed* v. *Western Union Tel. Co.,* 135 Mo. 661, S. C. 37 S. W. 904, 58 Am. St. 609 and 34 L. R. A. 492, the measure of damages allowed was the difference between the price actually received and the market value of the property. In *West. Union Tel. Co.* v. *Shotter,* 71 Ga. 760, the offer was "sixty-four" and transmitted at "sixty," it was held, "It was error to charge to the effect that the measure of damages would be the difference between what the vendor received and what he intended to offer the property for; there being no evidence that he could have obtained the price demanded." It was also said that the "measure of his recovery against the company would be the difference between what he actually received for the property and what he would have received but for the mistake, that is, the market value of the property at the place to which the telegram was sent." See also *Ayer* v. *West. Un. Co.,* 79 Me. 493, S. C. 10 At. 495, and 1 Am. St. Rep. 353; *West. Un. Co.* v. *Dubois,* 128 Ill. 248, S. C. 15 Am. St. Rep. 109. In 27 *Am. & Eng. Ency. of Law,* 1069, it is said: "When a message announcing prices, sent

in contemplation of a trade, is erroneously transmitted, the party injured through acting upon the erroneous message may recover the amount of his actual loss caused by the decrease in the price he obtained or, *in case he is a purchaser,* the increase in price he is obliged to pay in consequence of the error." "Where the mistake is discovered by the seller, after the delivery of the goods to the buyer, the measure of damages is the difference between the price named in the telegram as delivered for transmission and the price which the seller could, by exercising reasonable prudence and diligence, obtain for the goods and not the difference between the price named in the telegram as delivered for transmission and as delivered to the addressee. *Pepper* v. *Telegraph Co.,* 87 Tenn. 554," as stated in note to *Hays* v. *W. U. Tel. Co.,* 70 S. C. 16. In 3 *Am. & Eng. An. Cases,* 429, it is said in that note: "But the difference between the prices named in the telegram as delivered for transmission and as delivered to the addressee may be accepted as the measure of damages actually sustained by the sender when the goods are delivered to the addressee before the sender discovered the mistake, when the sender accepts payment on the basis of the lower price, and when the sender could not reduce his loss by disposing of the goods in some other manner,"—citing *Fisher* v. *W. U. Tel. Co.* (Ky.), 84 S. W. Rep. 1179 and *Pepper's Case, supra.* Other cases might be cited, but we have found no case which we could follow which sustains the measure of damages fixed by the plaintiff's prayer, under such circumstances as we have in this record. As we have already pointed out, such may well be the damages allowed, when the suit is by a purchaser who has been required to pay more than was intended by reason of the error in the transmission of the message, for the difference between the two prices is his actual and fixed loss, but when the seller sues it is altogether different, for it does not follow that the purchaser would have accepted his offer at the higher price and hence what he actually loses, if anything, is the difference between the price named by him in the telegram and what

he could by exercising reasonable prudence and diligence obtain for the goods—not exceeding the difference between the price named by him in the telegram and what he received from the purchaser.    Under some peculiar circumstances there. may be some deviation from the rule, as explained in the case of *Pepper* v. *West. Un. Tel. Co., supra,* but there is nōthing in this case to make an exception to the general rule.

The measure of damages therefore fixed by the plaintiff's second prayer was not correct, and it should have been rejected.    The plaintiff's first prayer, as originally drawn, submitted to the jury to find whether the difference between the prices named in the telegram sent and the one delivered was the loss of plaintiff, and, if so found, instructed the jury that the plaintiff was entitled to recover the difference, but the modification of the prayer is in such shape (evidently due to some omission) that we cannot tell what was intended, and hence say nothing more as to that.    The defendant's first and third prayers were properly rejected because the evidence of Mr. Thomas tended to show that they had commenced the preparation of the gum before they knew of the mistake in the transmission of the telegram, and that having commenced it they could not stop it without a loss, possibly greater than the difference between the two prices.    As we have said, those questions were for the jury.    It is proper to add that the recovery under the decisions cannot exceed the difference between the two prices, but inasmuch as we cannot say from the record that the jury if properly instructed would have allowed that amount we must reverse the judgment.

> *Judgment reversed and new trial awarded,*
> *the appellee to pay the costs.*