# THE MAYOR AND CITY COUNCIL OF BALTIMORE,
### a Body Corporate.

*vs.*

## JOHN C. STALFORT.

*Negligence: municipal corporations; defective gutters and drains  Pleading: allegata and probata.  Prayers. Evidence: conditions long after question in dispute.*

A plaintiff can not recover otherwise than according to the allegations of his declaration.                          p. 280

A prayer based upon facts which are different from the facts alleged in the declaration in respect to the causes of injury alleged, is improper and should not be allowed.          p. 282

In an action by a plaintiff against a municipal corporation for injuries alleged to have been caused by the defective manner in which a pavement had been laid and a gutter made, in the absence of all testimony as to how such work had been done, testimony of the condition of the pavement and the gutter sixteen months after the work had been done, is not admissible in evidence.                          p. 281

*Decided April 9th, 1914.*

Appeal from the Superior Court of Baltimore City. (Daw-kins, J.)

The facts are stated in the opinion of the Court.

The Cause was argued before Boyd, C. J., Briscoe, Burke, Pattison, Urner, Stockbridge and Constable, JJ.

*Edward J. Colgan, Jr., Assistant City Solicitor,* and *S. S. Field,* the City Solicitor of Baltimore City, for the appellant.

*James A. Latane* and *Albert S. J. Owens,* for the appellee.

Pattison, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered in the Superior Court of Baltimore City by the appellee, John C. Stalfort, against the appellant, the Mayor and City Council of Baltimore.

The declaration, consisting of one count, alleges that the plaintiff is the owner of a leasehold interest in the premises known as 814 E. Lombard street, in the City of Baltimore, which are used and occupied by him as his place of business, and after alleging the power and duty of the defendant to open, construct, pave, maintain and keep in repair sewers and drains in and through the public streets and alleys in said city, it alleges that "along and through" Lombard street "there was, and still is, a sewer, drain and gutter for the purpose of carrying off the surface water therefrom," and "that the defendant in the performance of its duties and obligations aforesaid, undertook to tear up and remove said sewer, drain and gutter in front of and in the immediate vicinity of the plaintiff's premises on said Lombard street, and subsequently to reconstruct said sewer, drain and gutter, and to relay and repave the same for the purpose of carrying off the surface water aforesaid, and it thereupon became and was the duty of the defendant to reconstruct said sewer, drain and gutter and to relay and repave the same in a careful, proper and workmanlike manner, yet the defendant reconstructed said sewer, drain and gutter and relaid and repaved the same in a careless, unskilful and

negligent manner and left and allowed to remain in said paving large cracks and crevices in the spaces between the rocks and stones used in paving said sewer, drain and gutter in such way that instead of carrying off the surface water from said street, the said water settled in said cracks and crevices and penetrated into the earth below said sewer, drain and gutter and saturated the said earth for a great distance around, so that the same became soft and springy, and the said water percolated through the same to, through and under the foundation of the plaintiff's house and flooded the cellar of said house with large quantities of water * * * continuously from, on or about the 5th day of January, 1912, down to the time of the bringing of this suit. * * * by reason of which and on account of the careless, unskilful and negligent manner in which the defendant reconstructed said sewer, drain and gutter and relaid and repaved the same, the said house and structure of the plaintiff were greatly damaged and injured and the foundation walls thereof rendered unsafe, and the said cellar of said house was rendered unfit for use by the plaintiff, and that a large quantity of stock, consisting of leather goods and hides, being stored in said cellar for use by the plaintiff in his business, was greatly injured and damaged and rendered valueless to the plaintiff." To this declaration the defendant pleaded the general issue plea.

At the conclusion of the testimony taken by the plaintiff and defendant, two prayers offered by the plaintiff were granted, and of the prayers offered by the defendant, two were granted, one granted as modified, and the others were rejected. The defendant excepted to the action of the Court in granting the plaintiff's prayers and in refusing to grant its rejected prayers, and in overruling its special exception to the plaintiff's first prayer.

By the first prayer of the plaintiff the Court was asked to instruct the jury that should they find that the defendant or its agents built the sanitary sewer "along Lombard street in front of the plaintiff's property, and if the jury further find

in so doing the defendant or its agents tore up and removed portions of the street bed and gutter on Lombard street in the immediate vicinity of the plaintiff's property, and subsequently, after the construction of said sewer (if the jury so find) reconstructed, repaved and relaid the said torn up and removed portions of the street bed and gutter of said street in a careless, unskilful and negligent manner, and negligently *left and allowed to remain in certain portions of the said street bed and gutter at or near the northwest corner of Lombard and High streets certain ends of sheathing or lagging standing and protruding above the surface of the street,* in such a way that instead of carrying off the surface water from said streets, the water settled and penetrated into the nearby ground and eventually percolated and ran through the same into the cellar of the plaintiff's house, flooding the same and damaging and injuring his premises and property, then the plaintiff is entitled to recover in this action."

The defendant specially excepted to the plaintiff's first prayer for the reason that there was no legally sufficient evidence, (1) that the defendant tore up and removed portions of the street bed and gutter on Lombard street in the immediate vicinity of the plaintiff's property and thereafter reconstructed, relaid and repaved such torn up and removed portions of said street bed and gutter; (2) or that the defendant was guilty of any negligence in the prosecution of any work which it engaged in, in the bed of Lombard street, in the laying of a sanitary sewer therein and *in repaving over the trench in which said sewer was laid;* (3) or that the defendant left certain ends of sheathing or lagging standing and protruding above the surface of the street, either in a negligent or any other manner; (4) or that said ends of lagging caused any damage to the plaintiff.

And the defendant's first prayer asked the Court to take the case from the jury for a want of evidence, under the pleadings, entitling the plaintiff to recover.

We will consider together the rulings of the Court in granting the plaintiff's first prayer, and in overruling defend-

ant's special exception thereto, and in refusing the defendant's
first prayer.   In passing upon these rulings it will be neces-
sary for us to state at length the facts of this case.

The plaintiff, John C. Stalfort, a leather manufacturer,
was at the time of the alleged injury to his property com-
plained of in the declaration, January, 1912, the owner of the
building situated on the northeast corner of Lombard and
Albemarle streets, in the City of Baltimore, which at such
time was used by him in his business, and in the cellar of
which were stored the leather and hides which are said to
have been injured by water entering the cellar at the time
mentioned in the declaration.

The surface water upon Lombard street, at least east of
Albemarle street, was then carried off by means of the open
gutters upon the street.   In the fall of 1910 the city con-
structed a sanitary sewer under the bed of Lombard street
starting at a point east of High street, the next street east
of Albemarle street, and extending by and in front of the
plaintiff's premises to and beyond Albemarle street on the
west.   This sewer was laid on the north side of the street
and in constructing the sewer the city dug a trench about
thirty-three inches wide and ten or twelve feet deep in
which they laid a terra cotta pipe twelve inches in diameter,
and refilled the trench and repaved the street where the
trench had been dug.

It is alleged in the declaration that the defendant tore up
and removed "the sewer, drain and gutter in front of and in
the immediate vicinity of the plaintiff's premises on Lom-
bard street and reconstructed said sewer, drain and gutter
and relaid and repaved the same for the purpose of carrying
off the surface water, in a careless, unskilful and negligent
manner, and left and allowed to remain in said paving large
cracks and crevices in the spaces between the rocks and stones
used in paving said sewer, drain and gutter," etc.

The sewer, drain and gutter there mentioned is not the
sanitary sewer that we have spoken of, but the open gutter
on the north side of Lombard street in front of the premises.

of the plaintiff. It was in the construction of the sanitary sewer that the gutter is alleged to have been torn up, and it was in the repaving of the street or gutter, as alleged by the plaintiff, where the trench was dug, that the charge is made, that the gutter was not carefully and skilfully relaid and repaved. It is true, the plaintiff uses the words "sewer, drain and gutter," but the reference there made was to the open gutter, and it was so conceded in the argument.

This suit, therefore, is not brought to recover for injuries resulting from the negligent and unskilful manner of constructing the *sanitary* sewer, but for the reconstruction or repaving of the *open gutter* which had been removed and torn up, as alleged by the plaintiff, in the construction of such sanitary sewer. Nor is it brought to recover for injuries resulting from the negligence of the defendant in properly *maintaining* and keeping in safe condition the open gutter referred to.

As to the exact location of the sanitary sewer, the plaintiff testified that it was constructed "in the street, close to the gutter," and Covington K. Allen, assistant engineer to the Sewerage Commission, who was in charge of the sanitary sewer, testified that the northernmost line of the sewer trench was about eighteen inches from the curb of Lombard street. In opening the trench and refilling it, "the gutter or curb along Lombard street was not removed," but that in digging the trench he encountered at the corner of High and Lombard streets the iron gutter plates which were directly in the line of the trench, and these had to be removed so that the trench could be dug under them. Upon the sides of the trench was driven lagging two inches thick, and driven, we may assume, to or about the depth of the trench. To what extent the pavement between such lagging and the curb, a distance of eighteen inches or less, was disturbed in the removal of the pavement at the place where the trench was thereafter dug, and in digging this trench and in laying the pipe therein, is not specifically stated, but we do not think it a violent presumption that upon the completion of the work upon the sewer that

at least a portion of this paving in the gutter was in such a condition as to require repaving or relaying. It was put in evidence, however, by the city that upon the completion of the sanitary sewer the pavement that had been removed, torn up or disturbed in digging the trench and laying the sewer was thereafter *properly relaid and repaved.*

The evidence of the plaintiff as to the condition of the repaving does not relate to its condition at the time that it was done, but at the time of the injury, sixteen months after its completion. It is true, the witness Dehne, produced on the part of the plaintiff, stated that he saw this work being done and that it was not properly done, but the only reason he could give for stating that it was not properly done was because it was done by Italians.

The evidence of the plaintiff as to the defects—the cracks and crevices—in the pavement, at the time of the injury, is indefinite, especially so as to the exact location of such defects. In fact, these defects seem to have been largely disregarded by the plaintiff in the prosecution of his suit. He relied, as it would seem, mainly, if not altogether, and based his right of recovery, upon the condition that was found in the gutter at the corner of High and Lombard streets under the iron gutter plate mentioned above. This is shown by his prayer, which makes no mention whatever of the defects mentioned and described in his declaration. As to such defects he is silent in asking instructions of the Court.

The evidence of the plaintiff as to the condition of the gutter under the gutter plate that we have referred to, was confined altogether to the time of the injury, except the testimony of Dehne, to which reference will be hereafter made. The plaintiff testified "that a man from the Water Department located a very large hole at the corner of High and Lombard streets that was not paved at all. There was a kind of iron plate laid there and it was not paved at all and the water just went in there. That he saw a hole under the plate where the water ran right in underneath; even on the side of the gutter it was not paved right." Edwin D. Stal-

fort, a son of the plaintiff, stated that the gutter underneath the gutter plates was left unpaved entirely. "There were planks left there with no cobble stones whatever over them, or around them, at all, as is usually done in paving, and being left open like that the water had a free flow." In his cross-examination he further referred to these planks, saying "that they were those that are used in forming trenches when work of that character is being done—that is laying planks of any kind. These planks were extending above the ground in some places as much as six inches. There was no paving there whatsoever, there were no cobble stones, there was no regular paving. The ground was very soft and mushy, having this water over it all the time, and the water naturally flowing down in there caused the depth to be quite great, that is, one could take a crowbar or something even longer and bury it completely." Another son, Arthur J. Stalfort, testified that he was present when the employees of the City Water Department came down and removed the gutter plate at the corner of High and Lombard streets. He saw under the gutter plate, "there was no paving there. There could be no paving because these planks were left sticking up six or eight inches above the ground and there could not have been any paving done. One of the men took a crowbar and just stood it on the ground and it sank in the ground and he nearly lost the crowbar." Otto Lang, a witness called by the plaintiff, testified that he saw under the gutter plate when it was removed by the city officials in January, 1912, and that at such time "there was no paving; there could not be any paving because those planks were left sticking up six or eight inches above the ground, and one of the men took a crowbar and just stood it on the ground and it sank in the ground and he nearly lost the crowbar."

The witness Dehne, who is employed by the United Railways Electric Company as foreman of its Sewerage Division, and whose duties are to look after its drains, including the drains under gutter plates, and see that they are kept open, testified that this was one of the gutter plates that he looked

after. That in the winter of 1912 he went to this place to clean out the drain under the gutter plate and that during the months of January, February and March he visited that point on an average once or twice a week. As we have already stated, he testified that he saw the gutter when it was being repaved by the Italians. He also testified that he had been familiar with the streets and the pavement thereof at the corner of High and Lombard streets since the spring of 1908; that at that time the street was paved with cobble stones and it was in good condition; that when they repaved it it was again paved with cobble stones. He was asked: "Well, what happened then?" Ans., "After they had finished it, on another occasion I went there to clean it out and these cobble stones had gone down, the whole thing had settled, there was no bottom there for it. The water was running on the dirty soil, the refuse that went in underneath it." He was then asked: "Did you see any lagging sticking up around there or anything of the kind?" An objection being made to this question it was sustained by the Court. He was then asked, "Well, did you see anything else there, Mr. Dehne?" Ans., "Well, I didn't take particular notice of anything there." Upon cross-examination he was asked, "You have also stated, I believe, that when the Sewerage people, as you say, had finished this work, they did repave under the gutter plate?" Ans., "Repaved, yes, sir, I seen that myself." Ques., "Shortly after it was done or being done?" Ans., "While it was being done" He then stated that his visit to this place, at the time he discovered the stones under the gutter plate had disappeared, was in January, 1912. That he reported it to the office of his company, but to no one else.

Mathias, another witness produced on the part of the plaintiff, testified that he was with Dehne in January at the times that he visited the place referred to at the corner of High and Lombard streets. That on one occasion he took off the gutter plate and found "holes in there." That he had his gum boots on and stepped into one of these holes "and went pretty near up to my knees." He never took much

notice of the holes; went there to clean it out and when he did so he left. He cleaned it out both before and after the sanitary sewer was put in. The holes were found there after the sewer was built, "although it got choked up before." And although he was asked to tell more about the character of the pavement and the holes that he spoke of, nothing was said by him as to the lagging concerning which the two sons of the plaintiff and Lang had testified.

Benham, superintendent for William H. McCarthy & Company, the contractors who laid the sanitary sewer and who repaved the surface where the trench had been dug, testified that they removed the gutter plate to dig the trench; that after the trench was dug and the sewer laid, the surface of the trench underneath the gutter plate was repaved in the same manner as other parts of the surface of the trench was repaved, and that there was no lagging sticking up. In describing how the repaving was done he said that after the trench was "back-filled" it was flushed and rammed and the lagging cut off and the surface of the trench covered with sand and paved over.

The plaintiff, who saw the gutter plate removed, and both Dehne and Mathias, employees of the United Railways Company, who had frequently visited the gutter at the place covered by the gutter plate and had cleaned it out, one of them having stepped in it, do not recall the existence of any lagging. And Dehne saw them when they were laying the pavement at this point, and yet when his attention was called to it and he was asked if he noticed anything else there other than what he described, he said he did not.

The declaration in stating the negligence charged against the defendant, upon which the plaintiff bases his right of recovery, alleges that the defendant in repaving the gutter in front of and in the immediate vicinity of plaintiff's premises on Lombard street, *"left and allowed to remain in said paving large cracks and crevices in the space between the rocks and stones used in paving said sewer, drain and gutter in such way that instead of carrying off the surface water*

from the street the said water settled in said cracks and crevices and penetrated into the earth below said sewer," etc.

In his prayer no allusion is made to the defects in the repaving of the gutter mentioned and described in the declaration, but by it the Court is asked to instruct the jury if it finds other conditions existing which are attributed to the negligence of the defendant, that is, if they find that the defendant left and allowed to remain in certain portions of said street bed and gutter *at or near the northwest corner of Lombard and High streets certain ends of sheathing or lagging standing and protruding above the surface of the street,* in such a way that instead of carrying the surface water from said street, the water settled and penetrated into the ground nearby, etc., that they must find for the plaintiff.

At the place where the lagging is said to have been seen, the witnesses for the plaintiff all testified that at the time of the injury complained of there was no paving there at all, but a hole in which water flowed and settled into the earth. Even though lagging may have been seen by the witnesses who have testified to that fact, at the place mentioned by them, it would not follow that it was not cut off and the pavement placed above it. If on account of the great flow of water at the place mentioned, the stones had been removed or had sunk in the ground and a hole, as testified to, was made there, it is more than probable that the ends of the lagging might have been seen in the hole, though below the surface of the pavement.

In the declaration in the case of *Smith Co.* v. *Smick,* 119 Md. 279, it was alleged that the defendant did not furnish the plaintiff with a reasonable, safe and proper place and machine in which to do and perform the work required of him, in that the plaintiff was negligently transferred from a small job press machine, that he had been accustomed to work on, and put to work on another machine of a much larger and different style, and that this latter machine was not protected by any shield or warning; that the same was dangerous, and that he was inexperienced in the use of the latter machine,

and no instructions were given him as to its use, and that while operating the machine his hand was caught and injured. The evidence disclosed that the machines were of the same style, and in construction differed only in some minor par ticular. That the large press ran regularly at the same speed and at the time of the accident it was running as slow as it could go. The presses were run in the same way, and the danger of operating the two was identical. The evidence offered on the part of the plaintiff was to the effect, that the injury was caused by the jumping or jerking of the machine while the plaintiff was feeding it. The plaintiff himself testi- fied, that when he had been working on the press for about a half hour, "all of a sudden the press gave a jerk, that quick, (indicating) and took my hand right up; sort of pulled me up with my hand." The cause of the jerking and jumping of the press was attempted to be explained upon several theories : First, because the set screw and lock nut were worn out, and secondly, "that the dust, etc., in the building got on the belt and made it hug the pulley and caused the jerk." We, in that case, said: "It is clear there is a manifest variance between the allegations of the declaration and the facts proven at the trial and set out in the record to sustain the plaintiff's theory of the case as made by the pleadings. "The burden of proof was upon the plaintiff to show that the injury was caused by the negligence of the defendant as alleged in the pleadings, and the defendant had the undoubted right to have the jury confined to the issue as made by the pleadings. *City Passenger Ry. Co.* v. *Nugent,* 86 Md. 360; *Fletcher* v. *Dixon,* 107 Md. 420; *Darby Co.* v. *Hoffberger,* 111 Md. 86. "It is clear, we think, that the case the plaintiff sought to prove at the trial, was a different case from the one alleged by the pleadings."

In the case before us, like the case from which we have just quoted, the facts alleged in the declaration in respect to the cause of the alleged injury to plaintiff's property, are altogether different from the facts stated in the plaintiff's prayer upon which he asked to recover.

It will also be borne in mind that all the evidence in the case, both that of the plaintiff and defendant, upon the question of the repaving of the gutter, was to the effect that it was repaved at the completion of the construction of the sanitary sewer, and the uncontradicted evidence of the defendant is that it was properly repaved. The gutter had been repaved sixteen months prior to the time of the alleged injury to the plaintiff's property, and it cannot be legally inferred, in the absence of evidence showing the defective repaving of the gutter, that it was defectively repaved because of the condition in which it was found sixteen months thereafter. And the plaintiff cannot recover under the pleadings in this case unless it be shown that such repaving was defectively done, and the burden of showing this fact is upon him. There is some evidence of the existence, at the time of the injury, of cracks, crevices or holes in the pavement at other places, though not very definitely located, but it is not shown that such cracks, crevices or holes were there at the time of the repaving, or at a period earlier than the time of the injury complained of, or that they were caused from any defective repaving of the gutter.

The case of *Hanrahan* v. *Baltimore City,* 114 Md. 517, is specially cited by the plaintiff in support of his contention that the variance between the aforesaid facts alleged in the declaration and the facts stated in the plaintiff's first prayer, is not sufficient to warrant the rejection of said prayer.

In the fourth count of the declaration in that case, it is alleged, that the trench therein mentioned, in which was used sheathing or lagging, was negligently, improperly and unskilfully dug and built, so as not to protect the house and property of the plaintiff against injury by the digging and building of said trench, and in consequence thereof, the plaintiff's property was injured and damaged as therein stated. In that case the use of "proper and sufficient shoring, sheathing" or lagging was specially mentioned and involved in the allegation charging the defendant with negligence in the construction of said trench; and as the sheathing or lagging was

not cut off below, but left protruding, above the surface, producing the results there shown by the evidence, it was proper in that case to mention and include this fact with other negligent acts of the defendant, as disclosed by the testimony, in holding that the prayer of the defendant removing the case from the consideration of the jury should not have been granted.

For the reasons we have stated, we think the Court was in error in granting the plaintiff's first prayer—and in not granting the defendant's first prayer asking that the case be taken from the jury because of the want of legally sufficient evidence, under the pleadings, to entitle the plaintiff to recover.

The plaintiff's second prayer being dependent upon the correctness of his first prayer, it should also have been rejected.

The defendant's second and third prayers were properly rejected, under the pleadings in this case.

The defendant's fifth prayer should also have been rejected, as the question of notice to the defendant of the existence of the defects in the repaving of the gutter is not involved under the pleadings in this case.

Under the pleadings, we think the sixth prayer of the defendant should have been granted.

The defendant's seventh and ninth prayers we think were properly rejected.

The judgment of the Court below will be reversed.

*Judgment reversed and a new trial awarded,*
*with costs to the appellant.*